[Crim. No. 23374. Apr. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED DYER, Defendant and Appellant.

COUNSEL

W. Reece Bader, under appointment by the Supreme Court, Anne G. Bookin, Jon B. Streeter, Arnold A. Pinkston and Orrick, Herrington & Sutcliffe for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Kristofer Jorstad, Blair W. Hoffman and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—

## INTRODUCTION

On June 18, 1981, an information was filed in Alameda County Superior Court charging defendant Alfred Dyer with two counts of first degree murder—each count alleging a multiple murder special circumstance (Pen. Code, § 190.2, subd. (a)(3))—two counts of attempted murder (*id.*, §§ 187, 664) and four counts of kidnapping (*id.*, § 207). (All further statutory references are to the Penal Code unless otherwise indicated.) In addition, all

eight counts of the information alleged that defendant was armed with, and used, a firearm, and that he intentionally inflicted great bodily injury. (§§ 1203.06, 1203.075, 12022, subd. (a), 12022.5, 12022.7.) The information also alleged three prior felony convictions: one armed robbery and two burglaries. (§ 667.5, subd. (b).) Defendant pleaded not guilty to all eight counts and denied the special circumstances, the enhancements, and the prior convictions. He subsequently admitted the prior convictions.

A jury found defendant guilty of each crime charged, and found the special circumstance allegations to be true. The jury also found true all of the enhancements, except for two allegations of intentionally inflicting great bodily injury. The jury fixed the sentence at death for both counts of murder. Defendant's appeal is automatic. (§ 1239.) As will appear, we have concluded that the judgment should be affirmed.

FACTS

On November 8, 1980, defendant and two other men—Michael Jackson (defendant's brother) and Cleveland Ario—drove in Jackson's two-door Cadillac to the apartment of their friend, Belinda Murray, located in the San Antonio Village housing project in Oakland, California. Belinda shared the apartment with her two children, her brother Floyd, her friend Nora Fluker, and Nora's four children. The two-level apartment had a kitchen and living room on the first floor, and two bedrooms and a bath on the second floor.

Defendant (armed with a .38 caliber handgun), Ario (armed with a .45 caliber semiautomatic pistol), and Jackson arrived at Belinda's apartment around 9 p.m., bringing with them some cocaine and an open bottle of wine, which they drank. Shortly after their arrival, Belinda's friend Bennie Warren arrived at the apartment. Bennie had met Jackson before, but he had never met defendant or Ario before that night. Belinda introduced Bennie to the others, and they talked for awhile. Bennie found defendant to be "stable-minded" and "intelligent." Later, Belinda, defendant, Jackson and Ario went upstairs to Belinda's bedroom. Bennie started to follow them but Jackson told him to wait and that they would be right back. Once upstairs, Ario injected Belinda, defendant and himself with a mixture of heroin and cocaine, and Jackson injected himself with the drug. Nora joined them and also had some of it. Belinda received a small dose, which she recalled caused a brief pleasant feeling. The dose defendant received, which appeared to be the same size as the one given Belinda, had no apparent effect on him.

Defendant, Jackson and Ario then left the apartment. Belinda and Bennie also left, returning with gum, cigarettes, and another bottle of wine. They

talked with Nora in the kitchen; Floyd was upstairs with the sleeping children.

Around midnight, defendant, Ario and Jackson returned to the apartment. Defendant appeared in the same condition as when he had left. The three men went upstairs with Belinda and Bennie to Belinda's bedroom where they again injected themselves with drugs; Belinda did not inject this time, nor did Bennie. Defendant then lay down on Belinda's bed, covered his eyes with his arm and rested. He answered questions while lying down and heard Ario ask Belinda to keep his gun for him. Ario then gave his gun to Belinda and she placed it in her closet. Bennie left the apartment soon thereafter, followed by Jackson and Ario.

Defendant "awoke" about five minutes later. He appeared startled and asked Belinda if his brother (Jackson) had removed his rings from his fingers. Belinda said she did not know. Defendant concluded that Bennie must have taken his rings. Defendant told Belinda to give him Ario's gun, which he stuck inside his pants along with his own .38 caliber gun. He then asked Belinda to accompany him through the housing project in search of Bennie; he especially wanted to check out a few places where Bennie might attempt to pawn the rings.

Defendant talked with Belinda while they walked. He appeared angry, but not intoxicated. He walked in his usual way and he "talked like he normally did when he's mad." He told Belinda that he was going to kill Bennie if he found him that evening and that if he could not find him, he was going to "whip his ass" when he did.

While walking, Belinda and defendant met Robert Fluker (Nora's brother-in-law) and his "common law" wife, Carol Tiexiera. (Belinda testified to this meeting at both the preliminary hearing and trial.) At all times, according to Belinda, defendant appeared to be in normal condition; he did not seem intoxicated or "spaced out." There was nothing unusual in the way defendant walked or talked during the search for Bennie. The two soon returned to Belinda's apartment.

On their return, Belinda and defendant found Nora writing a letter at the kitchen table. Defendant sat on the living room couch and Belinda went upstairs. Belinda heard a knock at her back door about five minutes later and, looking out her bathroom window, saw Bennie standing at the door. She rushed downstairs and found defendant pistol-whipping Bennie on the head; defendant had his gun in one hand and Ario's gun in the other and was beating Bennie on both sides of his head, drawing blood from each side. Bennie's face was bloody and he was almost unconscious. Bennie testified

that when he returned to Belinda's apartment defendant appeared "angered but in control."

Defendant demanded that Bennie return his rings; Bennie insisted he did not know what defendant was talking about and that he did not have any rings. Nora intervened in an attempt to stop the pistol-whipping, but defendant told her that nobody was going to get hurt. He instructed Bennie to sit in a chair in a corner of the kitchen and told him, "You better pray that my brother has my rings." At all times during the beating, defendant appeared normal and in control of himself.

Within minutes, Jackson's car drove up. Belinda ran outside and asked him whether he had defendant's rings. She followed Jackson and Ario into the kitchen where Jackson asked defendant what was the matter. Defendant pushed him away with one hand; defendant still had a gun in each hand at the time. Jackson appeared upset by defendant's act and left the apartment. Belinda and Nora went outside and quieted him; he then went back inside. This time, when defendant saw Jackson he gave him one of the guns. Jackson immediately became violent. He pushed both Belinda and Nora and commanded them not to move. Defendant, his gun still trained on Bennie, told Ario to search him. Ario searched Bennie, taking off his shoes and socks, checking his pockets, removing his wallet, and taking his gold rope chain. No rings were found. During the search, defendant kept his gun pointed at Bennie and told him, "You're a dead man."

Upon hearing that remark, Ario told defendant that if he killed one of them he would have to kill the others as well. Defendant replied that he would not kill any of the children. Ario then said that Floyd was upstairs and he ran to get him. Floyd was then pushed and shoved down the stairs and into the kitchen. Ario went outside and turned the car around, and next exited the car and held the driver's door open while Jackson marched the four captives (Nora, Belinda, Bennie and Floyd) out to the car at gunpoint. Defendant remained at the kitchen doorway with his gun pointed at them. He then walked to the car and stood at the open driver's door. On the way to the car, one of Belinda's neighbors saw her and yelled from her next-door house, "Where in the hell are you going this time of night?" Before Belinda could respond, Jackson forced her into the car. Defendant likewise forced Bennie into the car.

The four hostages sat in the back seat; Ario was behind the wheel and Jackson was on the passenger's side of the front seat, with defendant between them. Bennie was behind Ario with Nora to his right; Floyd was to her right and Belinda was next to Floyd and behind Jackson. As Ario drove off, the four hostages began arguing with each other, urging whoever had

the rings to return them; none of them, however, admitted having the rings. Jackson finally turned around, gun in hand, and ordered them to "shut up." Ario then said that they should "kill that bitch first," referring to Belinda. When Belinda asked why, Ario explained that she and her friend had sent his brother to prison. Also during the ride, Floyd asked defendant approximately three times, "Why do you want to take me out?" Defendant told him to "shut up" and stuck his gun in Floyd's face.

After riding about 10 minutes, someone in the front seat said, "Right here is cool." The car came to a stop and defendant said, "Get out." Ario exited the car, followed by defendant, who commanded Bennie to climb out. Bennie and Nora exited on the driver's side, and Belinda and Floyd left from the passenger's side. Defendant still had the .45 automatic in his hand, pointed at the hostages. He instructed the four to walk to the rear of the car. They were then told to walk straight ahead. They walked single file for a short distance before they were told to stop. While Ario was turning the car around, Jackson, still holding the .38 caliber revolver, ordered Belinda to lay face down on the ground next to her brother, Floyd. Defendant ordered the others to lay face down also; Nora was next to Floyd and Bennie was next to Nora. Before lying down, Belinda saw that defendant still had a gun.

After she lay down, Belinda looked up. It was very dark so she was unable to see her captors. She did, however, see "the fire coming" and she heard a loud noise as the first shot was fired. She threw her arms up over her head and passed out. (One shot had struck Belinda in her right arm, breaking the bone in four places.)

When the hostages were ordered to lie face down, all of them obeyed except Floyd, who stayed on his knees. Bennie heard three shots from the .38 caliber revolver come from his left, where Belinda was lying. (Bennie had been a member of the National Rifle Association since age 13. He had won several trophies and awards for marksmanship and was very familiar with guns.) He then heard scuffling noises, as if someone was being beaten. Bennie observed Belinda being beaten up while she was unconscious; her jaw was broken in two places. Someone said, "This bitch ain't dead yet." Bennie heard a few more shots and someone say, "If she's not dead now, she'll be dead by morning." Bennie thought the additional shots also came from the .38 caliber revolver.

Bennie next heard some shots fired from the .45 caliber gun, followed by more scuffling sounds. (Apparently Floyd had tried to escape; there was evidence that he had been involved in a struggle prior to his death.) Bennie then heard someone walk toward him. He looked up and saw defendant, holding the .45, about a foot away from Nora. Defendant fired three more

shots; each time a bullet entered Nora's body, Bennie "could feel her fluttering and jumping."

Defendant then stepped in front of Bennie. Bennie got up on his knees; defendant pointed the gun at his head and fired. The bullet struck Bennie over his right eye, grazed him near his right temple. Bennie flipped over backwards and, before losing consciousness, heard someone say, "If they're not dead now, they'll be dead by morning," and someone else say, "Check their pulse." Bennie then passed out.

When Belinda regained consciousness, she felt someone taking her pulse and heard him say, "The bitch is not dead." A gun was placed against her head and Belinda heard three clicks but the gun did not fire. Someone then said, "Man, let's get out of here." Belinda "played dead" until the car drove off. None of the assailants appeared intoxicated at any time during the entire evening.

Once the car left, Belinda arose and ran down the highway looking for help. She eventually came to a house. There was an unlocked car in front of the house, and Belinda entered it and blew the horn until a man and a woman came outside. These people telephoned for an ambulance and for the police, and Belinda was transported to the hospital.

In the meantime, Bennie had also regained consciousness. He managed to reach the road, where he flagged down a police car. Bennie showed the officer the location of the shooting scene, and he was then taken to the hospital.

An autopsy of Floyd's body disclosed four gunshot wounds near the left ear, nose, left shoulder, and the base of the skull. At least two of the wounds were caused by .38 caliber bullets. An autopsy of Nora's body disclosed three gunshot wounds near the left eye, the forehead, and the left shoulder blade. At least one was caused by the .38 and at least one wound was caused by the .45.

The theory of the defense was diminished capacity. Defendant did not deny, or attempt to justify, his actions at the murder scene. Instead, according to appellate counsel, "[h]e contended that, due to drug-induced delirium, he could not remember what happened after he got out of the car and that, if he did shoot anyone, he did not have the capacity to form an intent to kill or to premeditate and deliberate." Defendant urged the jury to find him guilty of voluntary manslaughter.

Defendant's case relied entirely on his own testimony that he was intoxicated or "loaded." Under defendant's version of the facts, he snorted

cocaine and drank wine and brandy before his brother and Ario picked him up and took him to Belinda's apartment. He testified that Ario injected them with a "speedball"—a combination of cocaine and heroin—as opposed to straight heroin. He claimed that after he was given the injection he vomited. Defendant asserted that everyone at the apartment was given a speedball, including Bennie. (This assertion contradicted Belinda's testimony that in the 11 years she had known Bennie she had never seen him use drugs.)

Defendant testified that when he left Belinda's apartment with Jackson and Ario they went to a party where he smoked marijuana and drank gin. They then returned to Belinda's where, according to defendant, Ario injected him with another speedball and he again vomited. He further testified that everyone was injecting speedballs and smoking in the room and that he fell asleep. When he awoke, there was no smoke in the room and everyone had left. He then noticed that his rings, money and gun were missing. (Belinda had testified that defendant said only his rings were missing.)

According to defendant, he asked Belinda what happened to his gun and she told him that she had put it in the closet with Ario's. He asked for the guns and asked Belinda where Bennie lived; Belinda gave him the guns and purportedly said that she would show him. (Belinda had earlier testified that she had no idea where Bennie lived at the time.) Defendant asserted that he next walked through the housing project following Belinda's lead; according to defendant, they never entered anyone's house and they soon returned to Belinda's apartment.

Defendant testified that when Bennie arrived, Belinda opened the door and let him in. Defendant asked Bennie for his rings and, according to defendant, Belinda added, "Give him back his stuff, Bennie. You know you got it." Bennie purportedly said, "I didn't think you would do me like that." Bennie and defendant then began arguing and defendant started hitting him with the guns. Defendant admitted pistol-whipping Bennie but testified that he was "confused, hurt and mad" and that he "didn't know . . . what was actually going on." He also recalled that when he stopped beating up Bennie, he squatted down in front of Bennie with the guns in his hands. He remembered Jackson walking up to him and also recalled pushing Jackson away.

The next thing defendant assertedly recalled is that he was sitting in the car. He testified he did not search Bennie at the apartment, and did not recall anyone else searching him. He also testified that he said nothing during the car trip; he just sat with his head down, crying. Jackson purportedly put his arms around him and told him that "it would be cool."

Defendant recalled the car had stopped. He also remembered exiting the car and hearing gun shots, but he did not remember whether he fired any shots. He did not deny shooting anyone, but said he simply could not remember doing so; he recalled only that he was "upset," but not mad. He recalled crying while hearing the shots. When asked at trial if he killed anyone, defendant said, "It's possible. I had a gun. I don't know."

Defendant next recalled being at a friend's house the following morning. He could not remember the interim period very well, but he thought that Ario was driving the car and that Jackson was telling him and Ario to "be cool" because "everything is going to be all right." He remembered being at his friend's house later that day; he was "confused" and "trying to put things together." He stated that his "head was still spinning and pounding" and recalled staring out the window but he did not remember what he was looking at. He testified that when he was at his friend's house, he knew that Belinda, Bennie, Floyd and Nora "wasn't [sic] with us any longer." He also remembered that Ario and Jackson were at his friend's house with him, and that Ario left at some point during the morning to get some more heroin and cocaine.

Defendant testified that he took some more cocaine and then called his mother. She told him that Floyd and Nora were dead and that the police were looking for him. He did not try to contact the police. He told his mother, "When I get my head clear, mama, I'm going to turn myself in to the police." That conversation supposedly occurred on November 9, 1980. As of March 23, 1981, defendant was still in Oakland "hiding from everybody."

Defendant's primary defense witness, Kate B. Yago, M.D., was certified as an expert in the area of drugs that affect the brain. She opined that defendant had been suffering from a drug overload at the time of the killings. She admitted, however, that she had not personally examined defendant. Dr. Yago also conceded that defendant should have recalled certain events in light of his recollection of other events. Responding to a hypothetical question based on Belinda's and Bennie's testimony, Dr. Yago testified that a person such as defendant "would have to be clearheaded" to have acted the way he did. She was unable to name any drug-induced condition which could account for defendant's selective memory loss. When asked if she could think of any medical explanation for a hypothetical situation based on defendant's testimony, Dr. Yago admitted, "If I am to believe your hypothetical, then I can't."

The jury rejected defendant's claim of diminished capacity and found him guilty of two counts of first degree murder (Nora and Floyd), two counts of

attempted murder (Bennie and Belinda), and four counts of kidnapping. The jury also found true the multiple-murder special circumstance as well as the allegations of possession and use of a firearm contained in each of the eight counts. Finally, the jury found that defendant personally and intentionally inflicted great bodily injury on Nora and Bennie, but also found that he did not commit such acts on Belinda or Floyd.

The prosecution presented no penalty phase evidence, other than proof of defendant's prior robbery and burglary convictions. Defendant called a psychologist, a coworker and his mother. The psychologist, Dr. Hilliard, explored defendant's childhood history and background, his drug and alcohol dependency, and his financial problems, concluding that his drug consumption probably affected his judgment and control during the day of the murders. (Various aspects of Dr. Hilliard's testimony and cross-examination are explored in greater detail hereafter.) The coworker, Victoria Siegel, testified as to defendant's dependable work habits as a bus driver and his ability to work well with children. Defendant's mother, Ellen Williams, testified regarding his childhood and good character.

Following the penalty phase, the jury sentenced defendant to death. Defendant moved for a new trial on the grounds of, inter alia, newly discovered evidence and ineffective assistance of counsel. The court denied the motion, as well as defendant's automatic motion for modification of the jury verdicts. The court sentenced defendant to death, and this appeal followed.

## I. Guilt Phase

Defendant raises several claims of error occurring during the guilt phase of his trial. We conclude that none has merit and that defendant's convictions should be affirmed.

### A. Cross-examination of Belinda and Bennie

Defendant asserts that the court erred in refusing to allow cross-examination of Belinda and Bennie about criminal charges filed against them on unrelated matters after the murders occurred and before trial commenced. Defendant claims that the court's ruling violated the confrontation clause of the Sixth Amendment. Our examination of the record reveals no such violation.

#### 1. The In Camera Hearing on Belinda's Unrelated Offense

During defendant's cross-examination of Belinda, the court held an in camera hearing on the issue of the admissibility of evidence that Belinda

had pleaded guilty to misdemeanor theft in May 1983. Defendant sought to establish that Belinda, who had been charged with burglary in October 1982, was allowed to plead guilty to the lesser included offense of theft as part of a bargain made to secure her trial testimony implicating defendant.

During the hearing, defense counsel asked Belinda, "Did your lawyer [in the burglary case] inform you that your testimony in this case would be helpful in regards to your changing and giving a plea?" Belinda replied, "No, he didn't." Belinda also denied that anyone from the district attorney's office told her that if she were to plead guilty, she would receive a reduced sentence in exchange for her testimony in this case.

The court then ruled that defense counsel would not be permitted to inquire into the foregoing matter, and defense counsel did not object to the court's ruling.

2. *The In Camera Hearing on Bennie's Unrelated Offense*

During defendant's cross-examination of Bennie, another in camera hearing was held. The issue in this instance centered around the fact that Bennie was arrested on September 2, 1982, after he drew a gun to defend himself, his wife, and his son, against a man who threatened them with a knife. He had been charged with receiving stolen property (the gun), possessing a loaded weapon, carrying a concealed weapon, and brandishing a weapon; evidently the police believed the gun had been used in a prior crime. Sergeant Mellott of the Oakland Police Department spoke with Bennie after his arrest and assured him that he would investigate the charges, which were later dismissed.

Defense counsel sought to establish that Bennie was a "police agent" and therefore was biased in favor of the prosecution. Bennie admitted that he "keep[s] in contact with . . . Sgt. Frank Mellott quite a bit." He said that following his arrest, Mellott visited him at the jail; he did not know how Mellott learned of his arrest. Mellott told Bennie that he would investigate the charges against him; the charges were eventually dismissed.

Bennie testified to the reason for the dismissal as follows: "This is what [Mellott] told me. He told me that the District Attorney's Office didn't want to involve this [assailant who drew the knife] . . . didn't want to charge this other guy because he was a crazy person, he was a nut. . . . They said if they subpoenaed him [to testify against Bennie] he would probably never come to court anyway so it would end up being thrown out . . . . They could tell that he [the assailant] had been—I think they checked and seen [*sic*] that he had been in mental hospitals or something . . . ."

The prosecutor brought to the court's attention the fact that Bennie had testified at Ario's trial—which ended in April 1982—*before* Bennie was arrested for this unrelated offense. He was also already in the process of testifying at Jackson's preliminary hearing at the time of his arrest. The charges were dismissed outright, not on condition that he cooperate.

Bennie also admitted that he had worked as an informant on other cases with Mellott, and that some of these cases had arisen after the murders with which defendant was charged. Bennie, however, was never compensated for his assistance, and had never entered into any deals with the police whereby charges against him would be dropped in exchange for information.

After hearing all of the evidence, the court concluded that the only issues probative of Bennie's bias were: "The identification of Sgt. Mellott as a person who has been involved in the continuing investigation in this case and the fact that [Bennie] has been working with Mellott on other matters unrelated to this case, and that's all." The court instructed defense counsel to limit his cross-examination on these issues "to whether [Bennie] has a bias toward the prosecution." The court specifically ruled that evidence of Bennie's arrest record was inadmissible.

In sum, the defense was allowed to inform the jury that Bennie had worked for the police and was still working for them, evidence which was relevant to a determination of possible bias or motive. The defense was not permitted, however, to question Bennie about the unrelated offense because there was no evidence that the charges were dismissed as part of a bargain for his testimony against defendant.

3. *Discussion*

■ On appeal, defendant insists that the court's foregoing rulings denied him his right to confront and cross-examine. The thrust of defendant's argument is that it was a jury question whether Belinda and Bennie were telling the truth when they denied that any deal had been made with the district attorney's office. He relies on the traditional role of jurors in determining credibility of witnesses. The claim lacks merit.

The United States Supreme Court recently addressed a similar issue in *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674, 106 S.Ct. 1431]. In that case, the defendant, charged with murder, sought at trial to discredit the testimony of witness Fleetwood "by questioning him about the dismissal of a criminal charge against him—being drunk on a highway—after he had agreed to speak with the prosecutor about [the] murder." (*Id.*, at p. 676 [89 L.Ed.2d at p. 681].) The prosecutor objected to this line of

questioning and the trial court held an in camera hearing on the matter. (*Ibid.*)

During the hearing, "Fleetwood acknowledged that the drunkenness charge had been dropped in exchange for his promise to speak with the prosecutor about the murder, but he denied that the agreement had affected his testimony." (*Ibid.*) The trial court prohibited the defendant from cross-examining Fleetwood on the point, finding that the probative value of the evidence was outweighed by its prejudicial effect. (*Ibid.*) Defendant was convicted and appealed.

The Delaware Supreme Court reversed because "the bias of a witness is subject to exploration at trial and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (475 U.S. at p. 677 [89 L.Ed.2d at p. 682].) Because the trial court barred *any* cross-examination of Fleetwood on the issue of the dismissal, "facts concerning bias that were central to assessing Fleetwood's reliability" were kept from the jury. (*Ibid.*) This ruling constituted a violation of the confrontation clause, which the Delaware Supreme Court believed to be reversible per se.

The high court agreed that a violation of the confrontation clause occurred because the agreement provided a motive for giving false testimony. The jury, had it considered such evidence, could well have found that Fleetwood was biased and his testimony should be discredited because the charge against him was dismissed in return for a promise to cooperate with the district attorney. The excluded evidence "furnished the witness a motive for favoring the prosecution in his testimony." (*Id.*, at p. 679 [89 L.Ed.2d at p. 683].)

The court disagreed, however, that the foregoing error required automatic reversal. Thus, the court observed "[t]he harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ('Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.')." (*Id.*, at p. 681 [89 L.Ed.2d at pp. 684-685].) The high court concluded that "improper denial of a defendant's opportunity to impeach a witness for bias . . . is subject to *Chapman* [*Chapman* v. *California* (1967) 386 U.S. 18, 24 (17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065)] harmless-error analysis." (*Id.*, at p. 684 [89 L.Ed.2d at p. 686].) Accordingly, the court

remanded the matter to the lower court for a determination of whether the error was harmless. (*Ibid.* [89 L.Ed.2d at p. 687].)

There is a crucial difference between the present case and *Van Arsdall, supra,* 475 U.S. 373: Both Belinda and Bennie denied any connection between the resolution of the charges against them and their trial testimony. Nothing surrounding the resolution of the charges would indicate a motive for favoring the prosecution when testifying. In *Van Arsdall,* the charges against Fleetwood were dismissed in return for his promise to cooperate. In the present case, the charges against Belinda and Bennie had been resolved *before* they testified against defendant; thus, no leverage remained over these witnesses. In addition, both Belinda and Bennie had cooperated *prior* to their arrest on unrelated charges, and continued to cooperate during the pendency of those charges against them. Indeed, both had already testified against Ario, and Belinda had completed testifying against Jackson before the unrelated offenses were resolved.

Further, as the Attorney General accurately observes, Belinda and Bennie had a much more forceful reason to cooperate—and to give false or biased testimony—than the mere dismissal or reduction of criminal charges against them: Defendant had tried to kill them. The jury was therefore well aware that these witnesses had a strong motive for favoring the prosecution with their testimony.

Defendant contends that, even if no agreement existed regarding the resolution of the unrelated offenses, the jury should have decided this "fact" question. We disagree. As with any other situation where admissibility or relevance is at issue, it is within the province of the court to determine whether the evidence shall reach the jury. "[The] trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination [into the potential bias of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive *or only marginally relevant.*" (*Van Arsdall, supra,* 475 U.S. 673, 679 [89 L.Ed.2d at 674, 683], italics added.) The trial court, not the jury, determines at the outset whether the evidence is relevant. In *Van Arsdall,* the witness admitted that an agreement existed regarding the dismissal of a charged offense. In the present case, both witnesses denied any such agreement. The fact that unrelated offenses were charged, and later dismissed or reduced, was therefore irrelevant to a determination of potential bias on the part of the witnesses.

Even if error occurred, it was clearly harmless beyond a reasonable doubt. The evidence against defendant was overwhelming and conclusive.

He did not deny committing the killings, nor did he contest the factual accounts of what transpired. His entire defense was that he was "unconscious" due to drug and alcohol intoxication during the critical 30 minutes of the kidnappings and murders, and that the jury should therefore return a verdict of only voluntary manslaughter. Evidence that Belinda and Bennie were charged with unrelated crimes, and that those charges were dismissed or reduced for reasons unrelated to the instant murder trial, would not have affected the jury's verdict.

Defendant, however, insists that prejudicial error occurred. He stresses that Belinda and Bennie were the only prosecution witnesses to testify as to defendant's "control of his faculties" and as to his being "an active participant in the crimes." Accordingly, he reasons that "their testimony was the only direct evidence rebutting [his] defense of diminished capacity." The argument is unconvincing. Even defendant's own expert was unable to explain his sudden and selective memory loss concerning the night of the murders. We conclude that if the evidence of the victims' unrelated offenses had been presented to the jury, it would not have seriously undermined the witnesses' credibility.

Defendant cites three California cases in support of his position that improperly restricting cross-examination of a witness to disclose possible bias requires reversal. (*People* v. *Adams* (1983) 149 Cal.App.3d 1190 [197 Cal.Rptr. 623]; *People* v. *Stewart* (1983) 145 Cal.App.3d 967 [193 Cal.Rptr. 799]; *People* v. *Allen* (1978) 77 Cal.App.3d 924 [144 Cal.Rptr. 6].) A close reading of these cases reveals that they are each distinguishable.

In *Adams*, the defendant was precluded from cross-examining a prosecution witness about his juvenile probation status. This ruling was error because "[the witness] was on probation, so in any brush with the law he certainly was aware of the consequences of noncooperation." (*Adams, supra*, 149 Cal.App.3d at p. 1193.) In *Stewart*, the trial court refused to allow the defendant to cross-examine her accomplice, who had separately pleaded no contest, regarding her motive for revenge against defendant. The trial court improperly rebuffed defendant's line of examination, stating, "she is under oath, telling the truth, that isn't revenge." (*Stewart, supra*, 145 Cal.App.3d at p. 977.) In *Allen*, the court similarly refused to allow proper cross-examination of an accomplice concerning two juvenile charges pending against him. (*Allen, supra*, 77 Cal.App.3d at p. 929.)

█ The foregoing cases simply illustrate the well established principle that the defense is entitled to elicit evidence that a witness is motivated by an expectation of leniency or immunity (*People* v. *Claxton* (1982) 129 Cal.App.3d 638, 660 [181 Cal.Rptr. 281]; *People* v. *Coyer* (1983) 142

Cal.App.3d 839, 842 [191 Cal.Rptr. 376]), or that he is on probation or parole (*Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105]; *People* v. *Espinoza* (1977) 73 Cal.App.3d 287, 291 [140 Cal.Rptr. 846]). Such evidence is obviously probative of bias or motive. Here, however, the charges against Belinda and Bennie had been dismissed or reduced *before* they took the witness stand against defendant. ■■■ In the absence of proof of some agreement which might furnish a bias or motive to testify against defendant, the fact that each witness had been charged with the commission of unrelated offenses was irrelevant. Any error in failing to admit such testimony was, therefore, clearly harmless.

**B.** *The Denial of Defendant's Motions for New Trial*

Defendant filed two motions for new trial. The first was filed by his counsel and sought a new trial on the basis of newly discovered evidence. The second was a pro se motion for new trial on the basis of ineffective assistance of counsel. The trial court denied both motions and defendant contends that the court erred in so ruling. We conclude otherwise.

1. *Newly Discovered Evidence*

■■■ Defendant filed a motion for new trial September 22, 1983, alleging newly discovered evidence. The evidence consisted of the declarations of Robert Fluker (Nora's brother-in-law) and his "common law" wife, Carol Tiexiera, stating that Fluker and Tiexiera recalled meeting defendant the night of the murders during his search for Bennie and observing that he was "not himself," and appeared to be "loaded" and "spaced out." Defendant contended this new evidence would refute Belinda's and Bennie's testimony that defendant was in control of himself before and during the murders. The trial court denied the motion, finding that the evidence was not newly discovered.

■■■ As we recently observed, "The standard of review of an order denying a motion for a new trial based on newly discovered evidence was established by this court in 1887: 'To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." . . . . [¶] "Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not be disturbed except for an abuse of discretion, . . .' " (*People* v. *Sutton* (1887) 73 Cal. 243, 247-248 [15

P. 86], quoting 1 Hayne on New Trial and Appeal, §§ 87-88.)" (*People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203].)

Defense counsel admitted during argument to the trial court that the names of both Robert Fluker and Carol Tiexiera arose at defendant's preliminary hearing held June 4, *1981*. At that hearing, Belinda testified that during their search for Bennie in the housing project, "we went all the way to the projects and we seen [*sic*] Nora's brother-in-law and sister-in-law and we asked him had he seen Bennie. ¶ Q. Who is Nora's brother-in-law and sister-in-law? [¶] A. Carole Fluker [*sic*] and Robert Fluker."

Additionally, defendant himself testified at his trial that he was in control of himself until Bennie returned to the apartment, i.e., *after* the search through the housing project. Thus, defendant's own trial testimony contradicted the declarations which formed the basis of his new trial motion.

Defense counsel nonetheless urged the trial court to consider the declarations as newly discovered evidence because counsel had not known that the witnesses could testify that defendant was "loaded" and "spaced out." In ruling on the motion the court stated: "It is critical that the newly discovered evidence be newly discovered, or unavailable to be discovered through reasonable diligence. The Court makes the finding that this is not newly-discovered evidence as a conclusion of law, and the Court makes the further finding that their [the two witnesses'] presence could have been sought through the exercise of reasonable diligence."

 Defendant, however, insists that admission of the new evidence would likely have resulted in a different verdict upon retrial, and that our opinion in *Martinez, supra,* 36 Cal.3d 816, mandates reversal under such circumstances. He misreads our holding in that case. In *Martinez,* the defendant was convicted of burglary and the trial court denied his motion for new trial based on newly discovered evidence; defendant appealed. We noted that the trial court denied defendant's new trial motion on two grounds: lack of due diligence, and doubt that a different result would be reached on retrial. (*Id.,* at p. 821.) We found that, had the newly discovered evidence been admitted, the prosecutor's case would have been seriously undermined. We therefore concluded, "we cannot uphold the denial of defendant's motion on the theory that the evidence in question would not affect the outcome of the case." (*Id.,* at p. 824.)

We then turned to the issue of diligence of counsel. We stressed that "the determination of guilt and innocence" was the "fundamental purpose" of trial, superseding the public policy to conclude litigation. (*Id.,* at p. 825.) Thus, "[t]he focus of the trial court . . . should be on the significance and

impact of the newly discovered evidence, not upon the failings of counsel or whether counsel's lack of diligence was so unjustifiable that it fell below constitutional standards." (*Id.*, at p. 826.) We therefore held that "[i]f consideration of the newly discovered evidence is essential to a fair trial and a just verdict, the court should be able to grant a new trial without condemning trial counsel as constitutionally ineffective." (*Ibid.*) Noting that the prosecution's case was *extremely* weak, we concluded: "The defense in the case before us presented newly discovered evidence—the testimony of [a new witness]—which in our opinion would probably lead to a different result at retrial. *Reliance upon counsel's lack of diligence* to bar defendant from presenting that evidence to a trier of fact would work a manifest miscarriage of justice." (*Ibid.*, italics added, citation omitted.) Accordingly, we reversed the trial court's ruling.

At no time, however, did we indicate that a defendant is entitled to a new trial whenever evidence that was not presented at a previous trial is sought to be offered on retrial. The evidence generally *must* be newly discovered.

Additionally this is not a case, like *Martinez, supra,* 36 Cal.3d 816, in which the prosecution's case was extremely weak; to the contrary, defendant never denied that the events took place substantially as Belinda and Bennie testified. Thus, even if the evidence somehow could be considered "new," defendant has failed to demonstrate that admission of the testimony of two witnesses that he appeared "spaced out" hours before the murders would likely have led to a different result. "The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court, and in determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. [Citation.]" (*People v. Hill* (1969) 70 Cal.2d 678, 698 [76 Cal.Rptr. 225, 452 P.2d 329].) We conclude the trial court did not abuse its discretion in denying defendant's motion for new trial.

## 2. *Ineffective Assistance of Counsel*

Defendant filed a pro se motion for new trial on September 24, 1983, alleging ineffective assistance of counsel. Defendant based his claim on counsel's failure to discover the "new evidence" contained in the declarations of Fluker and Tiexiera. The thrust of defendant's argument is that "reasonably competent" counsel would have investigated Fluker and Tiexiera as potential defense witnesses because they were the only witnesses who could have contradicted Belinda's and Bennie's testimony that defendant was in control of himself.

The trial court denied defendant's motion on several grounds. First, it ruled that defendant failed to meet his burden of proof in establishing counsel's incompetence. According to the court, at most, the record demonstrated that counsel's failure to pursue this line of investigation was "simply an oversight" rather than a "deliberate or intentional failure" evidencing incompetence.

The court then noted that the declarations of the "new" witnesses related to a period that "[was] not the most critical time, because the more critical time had to do with the time when Mr. Bennie Warren testified that you administered a pistol-whipping, and also the later time in the Oakland Hills when the shots were fired and the killings occurred."

Finally, the court found that "there has not been the withdrawal of any defense that might otherwise have been available" at trial, and that defendant had been represented by two "[h]ighly experienced lawyers" who had competently represented defendant.

■ We have enunciated a two-step test for determining whether counsel was ineffective: " '[Defendant] must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, [he] must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.' " (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144], quoting *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) *Fosselman* explained that "in cases in which a claim of ineffective assistance of counsel is based on acts or omissions not amounting to withdrawal of a defense, a defendant may prove such ineffectiveness if he establishes that his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. (*Pope, supra,* 23 Cal.3d at p. 425; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (33 Cal.3d at p. 584; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-695 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)

■ As previously mentioned, the trial court found that (1) defendant failed to meet his burden of proof in establishing counsel's incompetence; (2) the omission did not result in the withdrawal of a potentially meritorious defense; and (3) it is not probable that a result more favorable to defendant would result from retrial. These findings seem supported by the record. It is difficult to imagine how an event which took place hours before the murders could have been very relevant to the defense (and therefore

require investigation) where the defense was unconsciousness or diminished capacity during the critical 30 minutes of the kidnapping and murders.

It is quite conceivable that defense counsel thought it pointless to search for and interview witnesses who would probably either not remember the event, or whose lay testimony would have been of doubtful value in establishing a diminished capacity defense. It is noteworthy that defendant himself admitted that he remained in control until Bennie returned to the apartment. Thus, the Fluker/Tiexiera testimony would have contributed little to the defense of a drug-induced delirium, resulting in selective memory loss at the time of the murders. What transpired hours earlier would be immaterial except as related to the ingestion of drugs. The critical period, as the court observed, ran from the time Bennie returned to the apartment and defendant began pistol-whipping him, to the time the murders were committed. No potentially meritorious defense was lost by the omission complained of here.

Finally, even assuming arguendo that the failure to pursue this line of investigation demonstrated ineffective assistance of counsel, defendant would still not be entitled to relief without proving prejudice. (*Fosselman, supra,* 33 Cal.3d at p. 581; *Strickland, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693] [the defendant must show that counsel's deficient performance prejudiced the defense].) For the reasons previously explained, it is not reasonably probable that the verdict in this case was affected by counsel's omission.

## C. *Evidence of Defendant's Prior Convictions*

On the first day of trial, prior to the selection of the jury, defendant made a *Beagle* motion (*People* v. *Beagle* (1972) 6 Cal.3d 441, 451-454 [99 Cal.Rptr. 313, 492 P.2d 1]) to exclude his three prior felony convictions for impeachment purposes in the event that he testified in his defense. The court deferred its ruling on the motion. Shortly before opening statements to the jury, defendant admitted the priors and the court again deferred its ruling on their use for purposes of impeachment.

After the prosecution's case-in-chief, the *Beagle* motion was renewed, and the prosecutor advised the court that "we do not intend to introduce evidence of any prior convictions Mr. Dyer has suffered in these proceedings in this phase of the trial, assuming there is another phase. But as far as this phase of the trial is concerned only, we do not intend to impeach him with any of his prior convictions."

Defense counsel inquired "whether or not the prosecution's actions extend to any character witnesses that may be presented by the defense, that is

to say, that those witnesses themselves would not be asked about their knowledge of any prior felony convictions that the defendant may have.

The prosecutor replied: "It would apply to that. . . . [W]hat we commonly do with our witnesses, that is, if they have that information available, ask the witness not to volunteer that knowledge in the event I ask a question that is so broad that [it] would inadvertently bring that response. But the ruling, we assent to his request not to bring out in any way before this jury in this phase of the trial any evidence of any nature concerning any prior convictions suffered by the defendant in this phase of the trial."

Defendant subsequently took the stand and testified in his defense. The prosecution did not impeach him with his prior felonies. Next, defendant called Dr. Yago, his expert witness. She, too, was not questioned about defendant's prior convictions. Defendant then called Amanda Stevens, who had worked with defendant at the Oakland Head Start program for a few years prior to November 8, 1980. After a few general questions, defense counsel asked Stevens, "Have you had occasion to learn . . . about the reputation of Mr. Dyer?" Stevens replied that she had. At that point, the court requested that counsel approach the bench, and subsequently took counsel into chambers for an in camera hearing to clarify the extent of the prosecutor's stipulation.

Defense counsel stated, "it's my understanding, from the stipulation of [the prosecutor], that this matter was possibly dealt with when we had the discussion of the *Beagle* motion. As the Court recalls, . . . [defense cocounsel] asked [the prosecutor] if a waiver of going into any prior criminal conduct applied to any character evidence that we might bring in, and he indicated yes, unless he has other things he wants to bring in I have no problem with that, other than that part."

The court responded that, "I'm not indicating that he [the prosecutor] didn't say it, but it's not in my mind that that's what would be in the record, that he would waive it as far as any character testimony is concerned, or reputation testimony, if you wish to call it that. . . ." The prosecutor agreed that, "Never has it been stated or made clear or asked me can we ask reputation information and will you forego relevant information on his reputation, because then it would be basically asking me if I would let the jury hear false information about the defendant. And I would never accede to those kinds of points. So it was never clearly stated to me that there was an attempt to get me to be silent when the jury gets this false notion that this defendant has been nonviolent in his past. And I would not have acceded to those things, and I don't think the Court would require me to do that."

The court then asked the reporter to read back the record. After hearing the actual transcript, the prosecutor said, "[I]t's clear [defense counsel] did ask about character information, whether or not I would use the priors with those witnesses. My understanding at that time is that I had in mind that he would be bringing somebody in from the jail to talk about the defendant in terms of how he gets along with people there, or how they observed him in terms of where he was, or any kind of thing about his alibi or observations of the defendant. . . . We basically agreed we wouldn't bring out how the witnesses came to know the defendant, whether they met him in jail and know about his prior offenses. That's what I thought we had in mind. . . . [I]n terms of my understanding I have never understood of him asking me that he could bring in the evidence that the defendant is peaceful and nonviolent and that I would withhold from this jury that he has in the past been involved in life-threatening and very violent behavior . . . ."

The court noted that the issue being discussed at the time the stipulation was entered into was the *Beagle* motion, that is, the impeachment of defendant with his prior felony convictions in the event that he were to take the stand.

The court then stated its ruling. "My conclusion is that all counsel were acting in the utmost good faith . . . [and] that there was not a meeting of the minds between the parties as to what was meant by the other side. My conclusion is that the agreement was not intended to allow for the introduction of character evidence on the two issues [of nonviolence and truthfulness], or either of them, in this case. It is not because that is not what was specifically intended by [defense counsel] . . . when they asked the question of [the prosecutor], but that in the context in which the question arose it is more susceptible of the interpretation that [the prosecutor] intended simply to indicate that he would not on his own, through any witnesses of his, introduce this matter and that he, as a matter of fact, wanted expressly to warn defense counsel to be certain that any witnesses that they called would not blurt out anything about any priors, and he wanted also to assure counsel that he would not examine any defense witnesses who came on to testify with respect to other matters by inquiring as to the priors . . . ."

The court observed that there was no reason for the prosecutor intentionally to forgo his right to impeach defendant's character witnesses, and defense counsel never indicated that he meant to obtain from the prosecutor a waiver of his right to impeach any witness on defendant's veracity or his lack of violent propensities.

Defendant then requested a ruling on the *Beagle* motion with respect to impeaching his character witnesses. The court stated that the armed

robbery conviction would be admissible "with respect to any question about force and violence" and that the other two felony convictions—for burglary—would be admissible "with respect to the issue of reputation for peace and quiet."

■ We think the trial court's ruling was proper. "A party seeking relief from the burdensome effects of a stipulation may, in some cases, be fully protected by *interpretation,* i.e., by enforcement of the stipulation in a reasonable and nonburdensome way." (1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 223, p. 252, and cases cited, italics in original.) The court followed that procedure here; it did not purport to release the prosecutor from his stipulation, but merely interpreted it to reflect the probable intention of the parties.

The court could have simply released the prosecutor from the stipulation. "One type of recurrent situation involves the giving up of substantial rights by casual, hasty or improvident oral concession of counsel. In nearly all such cases relief is granted on either of the following theories: (1) The remarks did not amount to a stipulation; or (2) if they did, it should not be held binding in view of the circumstances under which the agreement was made, and its manifest unfairness to the aggrieved party." (*Id.,* at § 226, at p. 254.) The trial court in effect found here that the stipulation, as interpreted by defense counsel, should not be binding.

In addition, defendant has failed to demonstrate prejudice. He claims that "counsel relied on the stipulation in making a variety of tactical and other decisions, including whether or not [defendant] should testify, the order of witnesses and the questions to ask them." In rejecting this contention, the trial court properly observed that defense counsel had no knowledge of the stipulation until the close of the prosecution's case-in-chief, when the court, defendant and all counsel met to discuss the *Beagle* motion and the stipulation was entered into. *Immediately* after the stipulation was made, the jury was brought into the courtroom and the defense called defendant to the stand to testify in his behalf.

Defendant's decision to testify was not in any way affected by the disputed portion of the stipulation, which covered only character witnesses. Nor did the stipulation affect the testimony of the character witnesses. As the court observed, the questions asked the witnesses—both before and after the discussion in chambers—were all positive; only questions concerning reputation were omitted. Defendant does not explain how the order of the witnesses called would have differed, nor does he explain why the court's interruption of his examination of Stevens was prejudicial. The only "prejudice" defendant suffered is that he was denied the opportunity to offer

unchallenged and unimpeachable evidence of his "good" reputation. Accordingly, even assuming error, defendant was not materially prejudiced by the court's ruling.

### D. The Prosecution's Use of Peremptory Challenges

■ Defendant claims that the prosecution's use of peremptory challenges to exclude "persons with scruples about the death penalty but who nonetheless can follow the law" denied him his right to an impartial jury, a representative jury, and due process. Defendant concedes that we rejected this argument in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], but he complains of "exclusion of a broader group of jurors—those with reservations about the death penalty but who could vote to impose it in the proper case." Defendant's claim lacks merit. (*People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669].)

### E. Alleged Juror Misconduct

■ Defendant contends that he was denied his right to an impartial jury because one of the jurors allegedly gave an incorrect or incomplete response to a voir dire question asking whether any member of her family had been a crime victim. At the conclusion of the guilt phase of defendant's trial, defense counsel notified the court that he suspected juror misconduct on the part of Juror Jess F. The court thereupon "asked for additional information as to the foundation for any inquiries that might be made, or any steps that might be taken by the Court."

Defense counsel subsequently informed the court that he had spoken at the Santa Rita jail with F.'s estranged husband, Melvin P., who confirmed that F. had a brother who was killed a few years earlier. P. admitted that he was "not sure whether or not this was a criminal act . . . ." Juror F. was brought into chambers and questioned in camera. She admitted that her brother had been shot and killed five years ago, but that "It was an accident. They didn't let us know when the trial was going on so we don't know what happened to the man that accidentally shot him." Juror F. was "not too sure" whether criminal charges were brought against the assailant. She asserted that the event did not affect her verdict in the present case, and that "I believe it was an accident. . . . It was a party going on and he [the assailant] was just trying to clear everybody out of the party because there was a fight or something, and . . . the gun went off and it happened to hit my brother. . . . He didn't even know my brother, so he had no reason to just shoot him for nothing. So it was just an accident."

Defense counsel moved for a mistrial observing that Juror F.'s brother apparently had been shot in the head. The court denied the motion, finding

that F. was telling the truth when she said she thought her brother's death was an accident, and that therefore no crime was involved.

Defendant claims that the denial of the motion constituted an abuse of discretion. We disagree. The questions defendant prepared for voir dire were ambiguous; if the question at issue had asked whether any member of the family had been shot or killed by another person, F.'s answer probably would have been different. There is no evidence that F. was lying when she answered "no" to the question and its reference to "crime victims." (Cf. *People* v. *Blackwell* (1987) 191 Cal.App.3d 925, 929-931 [236 Cal.Rptr. 803] [unambiguous voir dire questions supported inference of deliberate concealment by juror].)

Defendant's supplemental brief requested that we take judicial notice that in 1977, F. filed a wrongful death action against the man who shot her brother. The case, however, could have been based on simple negligence, rather than criminal misconduct. Moreover, defendant leaves us to speculate as to the resolution of the civil case, and relies on "possibilities" to support his claim of juror misconduct.

Finally, defendant asks us to take judicial notice of a Court of Appeal opinion concerning the criminal charges brought against the man who shot F.'s brother. (See Evid. Code, § 459.) The opinion states that the man "struck the victim on the head four times with a pistol and then shot him in the back of the head." Defendant speculates that, "[i]t is almost certain that Ms. F.[ ] knew these facts and reached the same conclusion."

Each of the facts of which defendant now requests us to take judicial notice could have been presented to the trial court. The court specifically asked for all relevant information to support the claim of juror misconduct, but only now has defendant elected to produce it. Every document relevant to the issue of juror misconduct for which defendant asks judicial notice is dated before *1979*—more than four years before trial. Defendant fails to explain why these documents were not obtained and presented to the trial court in accordance with its request. In addition, they represent nothing more than incomplete documentation, and any judgment based on them would be founded on pure speculation. We therefore deny defendant's request for judicial notice and conclude that the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

F. *Beeman Error*

Defendant argues that the trial court erred in instructing the jury based on CALJIC No. 3.01, modified in accordance with *People* v. *Yarber*

(1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875]. He claims that this error withheld the intent-to-kill issue from the jury and thus requires setting aside its finding that he aided and abetted in the murder of Floyd Murray. (The issue only affects the Floyd murder count, as the jury found that defendant personally murdered Nora, and intended to kill both Bennie and Belinda.) We conclude the instructional error was harmless.

The court instructed the jury that, in order to convict defendant of Floyd's murder, it must find beyond a reasonable doubt and to a moral certainty that defendant "*with knowledge* of the unlawful purpose of the person who directly and actively commit[ted] or attempt[ed] to commit the crime *intentionally* aid[ed] or abet[ted] in its commission or attempted commission, or . . . *intentionally* advise[d] and encourage[d] its commission or attempted commission . . . . [¶] A person aids and abets the commission of a crime if *with knowledge* of the unlawful purpose of the perpetrator of the crime he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime." (Italics added.)

In *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318], we held that the *Yarber* instruction and the pre-1974 version of CALJIC No. 3.01 "both are sufficiently ambiguous to conceivably permit conviction upon a finding of an intentional act which aids, without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense." We concluded that "an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Ibid.*)

We have observed that where a defendant is on notice that his subjective intent at the time of the killing is at issue, the use of a *Yarber* instruction is usually harmless error. (*People* v. *Croy* (1985) 41 Cal.3d 1, 13-14 [221 Cal.Rptr. 592, 710 P.2d 392].) As *Croy* indicates, it would be a rare case where the defendant knew of the perpetrator's unlawful purpose and intentionally aided the commission of the offense without intending to facilitate that offense. Thus, a jury given the *Yarber* instruction probably would have reached the same verdict if it had been instructed under *Beeman, supra,* 35 Cal.3d 547.

Although *Croy* had adopted a harmless error standard founded on principles expressed in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], certiorari denied 469 U.S. 1229 [84 L.Ed.2d 366, 105 S.Ct. 1229], the Attorney General argues that the appropriate standard of review

for *Beeman* error, in light of two recent United States Supreme Court decisions, *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], and *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], is the *Chapman* "harmless beyond a reasonable doubt" test (*Chapman* v. *California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]). Applying the *Chapman* test, he asserts that the error here was harmless. Alternatively, he asserts the instructional error was harmless because the case falls within the so-called *Cantrell-Thornton* exception (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]) announced in *People* v. *Garcia, supra,* 36 Cal.3d 539, as adapted in this context in *People* v. *Croy, supra,* 41 Cal.3d.1, 14.

In *Croy* we recognized that "the instruction condemned in *Beeman,* unlike the pre-*Carlos* [*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 (197 Cal.Rptr. 79, 672 P.2d 862)] special circumstance instructions, did not entirely remove the question of the defendant's mental state from the jury's consideration. Former CALJIC No. 3.01, while containing the flaw discussed in *Beeman,* nonetheless informed the jury that the defendant's state of mind was relevant to the aiding and abetting question, explaining that the defendant must have aided the perpetrator *with knowledge of the perpetrator's unlawful purpose* in order to be found guilty as an aider and abettor." (*People* v. *Croy, supra,* 41 Cal.3d 1, 13-14, original italics.)

We concluded in *Croy* that this difference justified an adaption, in the *Beeman* context, of the *Cantrell-Thornton* exception retained in *Garcia*. We explained that, under these circumstances, "the parties at least recognized that the defendant's state of mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose. Thus, in many cases there may be no unfairness in assuming—for purposes of appeal and subject to the filing of a petition for writ of habeas corpus containing allegations to the contrary—that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given. Since, under former CALJIC No. 3.01, the jury could convict a defendant on an aiding and abetting theory only if it found that he acted with knowledge of the perpetrator's criminal intent, it may be possible in those cases for a court to determine that the *Beeman* error could not possibly have affected the verdict—i.e., that no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime. In those

cases the judgment could be affirmed." (*People* v. *Croy, supra,* 41 Cal.3d at p. 14, fn. omitted.)

The United States Supreme Court has held that instructions which completely remove the issue of intent from the jury's consideration may constitute a denial of federal due process principles, which require the state to shoulder the burden of proving beyond a reasonable doubt every fact necessary to the crime charged. (*Sandstrom* v. *Montana* (1979) 442 U.S. 510, 520 [61 L.Ed.2d 39, 48-49, 99 S.Ct. 2450] [instruction suggesting directed verdict or presumption relieving People of burden of providing every element of offense beyond a reasonable doubt]; see *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969] [conclusive presumption equivalent to a directed verdict].) In *Sandstrom,* the high court observed that a defective presumed-intent instruction was constitutionally defective because a reasonable juror could have believed that the issue of intent was conclusively established by reason of the instruction.

Although the *Yarber* instruction does not completely remove the issue of intent from the jury, it is nevertheless constitutionally defective because it might lead some jurors to believe that an act done with knowledge of the perpetrator's purpose was sufficient to satisfy the intent element required to establish a particular crime, thus in effect impermissibly lessening the burden on the prosecution to prove each element of that crime beyond a reasonable doubt. (*Beeman, supra,* 35 Cal.3d at p. 560.)

Subsequent to our opinion in *Croy,* however, the United States Supreme Court decided *Rose* v. *Clark, supra,* 478 U.S. 570 [97 L.Ed.2d 460, 106 S.Ct. 3101]. In *Rose,* the high court found that a jury instruction that homicide is presumed to be malicious violated *Sandstrom, supra,* 442 U.S. 510, in that it effectively eliminated one of the elements of murder, thereby unconstitutionally shifting the burden of proof on such element to the defendant. The Supreme Court went on to conclude that the *Chapman* harmless error standard was applicable to *Sandstrom* error. (*Rose* v. *Clark, supra,* 478 U.S. at p. 583 [92 L.Ed.2d at p. 474, 106 S.Ct. at p. 3109].)

*Rose* draws a distinction between fundamental trial errors that are reversible per se, and other federal constitutional errors which are subject to a harmless error analysis under *Chapman,* the former being the exception: "We have emphasized . . . that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to

ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (*Rose, supra,* 478 U.S. at p. 579 [92 L.Ed.2d at p. 471, 106 S.Ct. at pp. 3106-3107].)

*Rose* confirms that reversal is mandated if the error necessarily rendered the trial fundamentally unfair because it either "aborted the basic trial process [citation] or denied it altogether [citation]." (*Id.,* at p. 577, & fn. 6 [92 L.Ed.2d at p. 470, 106 S.Ct. at p. 3106].) But the court explained that instructional error of the type therein concerned should be analyzed in terms of its potential impact on the actual trial. Although the jury in *Rose* was erroneously instructed to presume malice from predicate facts, it still had to find the existence of those predicate facts. Furthermore, the jury was instructed that it had to find the defendant guilty beyond a reasonable doubt of every element of murder. "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury. [Citation.] In that event the erroneous instruction is simply superfluous: the jury has found . . . 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." (*Id.,* at p. 581 [92 L.Ed.2d at p. 472, 106 S.Ct. at p. 3108].)

The *Rose* court went on to clarify that "our harmless error cases do not turn on whether the defendant conceded the factual issue on which the error bore. Rather, we have held that '*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless.' [Citation.] The question is whether, 'on the whole record . . . the error . . . [is] harmless beyond a reasonable doubt.' [Citation.]" (*Id.,* at p. 583 [92 L.Ed.2d at p. 474, 106 S.Ct. at p. 3109].) In an instructive footnote the court suggested that harmless-error analysis may be applied to other types of instructional error: "Harmless-error analysis addresses . . . what is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, but in practice clearly had no effect on the outcome." (*Id.,* at p. 582, fn. 11 [92 L.Ed.2d at p. 473, 106 S.Ct. at p. 3108].)

Similarly, *Beeman* error is not the equivalent of a directed verdict for the state; it is not the type of instructional error that wholly prevents the jury from considering an issue (*Rose, supra,* 478 U.S. at p. 580, fn. 8 [92 L.Ed.2d at p. 472, 106 S.Ct. at p. 3107].) As one Court of Appeal has aptly observed: "Like the presumption of malice instruction in *Rose* v. *Clark,* former CALJIC No. 3.01 did not entirely remove the issue of intent from the jury's consideration, or prevent the jury from considering it. CALJIC No. 3.01, as

given, required the jury to find beyond a reasonable doubt, that the defendant knew of the perpetrator's wrongful purpose; thus, it 'did not entirely remove the question of defendant's mental state from the jury's consideration' (*People* v. *Croy, supra,* 41 Cal.3d 1, 13). Insofar as it omitted the element of intent to encourage or facilitate the perpetrator's purpose, CALJIC No. 3.01 operated like a presumption. [Citation.] Thus, the knowledge element operated as the predicate for a presumption of intent, as in the presumption of malice instruction in *Rose* v. *Clark.*" (*People* v. *Johnson* (1986) 190 Cal.App.3d 187, 199 [237 Cal.Rptr. 479].)

Most recently, the high court has reaffirmed that instructional error, even with regard to an element of an offense, may be tested under a harmless error standard. "In *Pope* [*Pope* v. *Illinois* (1987) 481 U.S. 497 (95 L.Ed.2d 439, 107 S.Ct. 1918)], the high court held that instructional error in informing the jury to employ a statewide commmunity standard in deciding the element of redeeming value in an obscenity case would be deemed harmless 'if it can be said beyond a reasonable doubt that the jury's verdict in this case was not affected by the erroneous instruction.' (*Pope, supra,* 481 U.S. at p. 502 [95 L.Ed.2d at p. 446, 107 S.Ct. at p. 1922].) The court stressed that the jury was not wholly precluded from considering the question of value; it was merely told to apply an incorrect standard in determining that element of the offense. (*Id.* at p. 503 [95 L.Ed.2d at p. 447, 107 S.Ct. at p. 1922].)" (*People* v. *Lee* (1987) 43 Cal.3d 666, 676 [238 Cal.Rptr. 406, 738 P.2d 752].)

In a footnote, the *Pope* court dismissed any suggestion that its earlier opinion in *Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689] was contrary to its holding: "To the extent that cases prior to *Rose* [v. *Clark, supra,* 478 U.S. 570 (92 L.Ed.2d 460, 106 S.Ct. 3101)] may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, e.g., *Cabana* v. *Bullock, supra,* 474 U.S. 376, 384, [fn. 4,] 88 L.Ed.2d 704, 106 S.Ct. 689 (1986), after Rose, they are no longer good authority." (*Pope, supra,* 481 U.S. at pp. 503-504, fn. 7 [95 L.Ed.2d at p. 447, 107 S.Ct. at p. 1922].)

 In accord with the holdings of *Rose* v. *Clark, supra,* and *Pope* v. *Illinois, supra,* we conclude that a reversal-per-se standard of review for *Beeman* error is inappropriate, and that henceforth the *Chapman* test, supra, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711], should be employed in such cases. (Cf. *People* v. *Lee, supra,* 43 Cal.3d at pp. 674-676 [error from conflicting implied malice instruction in prosecution for attempted murder analyzed under *Chapman*].)

 Applying the *Chapman* test here, the record demonstrates beyond a reasonable doubt that the *Beeman* error could not have affected the verdict.

The evidence, coupled with the jury's findings, showed that defendant (1) intentionally assisted in kidnapping Belinda, Bennie, Nora and Floyd; (2) joined in ordering the four victims into and out of the car and onto the ground; (3) personally and intentionally inflicted great bodily injury upon Bennie and Nora; (4) attempted to murder Bennie by shooting him in the head; and (5) murdered Nora by firing three shots from a .45 caliber revolver into her body at close range. In addition, Ario had told defendant at the apartment that, "if you kill one, you have to kill them all" and defendant replied he would not kill the babies. We must reject defendant's theory that, under the facts of this case, a properly instructed jury could have found he intended to kill Bennie, Belinda, and Nora but not Floyd.

 Defendant's supplemental brief raises a separate argument challenging the aiding and abetting instructions on the ground that "they created a mandatory presumption of an element of the crimes charged." Defendant asserts that a part of one of the instructions—read in isolation—"permits conviction on the ultimate offense[s] without a finding by the jury of any intent to facilitate or encourage that offense."

The instruction defendant complains of reads in pertinent part: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequence of any act that he knowingly aided or encouraged." Defendant's claim lacks merit. The record firmly demonstrates that the particular crime being contemplated by defendant, Ario and Jackson was—from the outset—*murder*. Thus, the "natural and reasonable or probable consequence" instruction could not have prejudiced defendant under the facts of this case.

G. *Jury Instructions on Implied Malice*

 Defendant contends that his convictions for attempting to murder Bennie and Belinda must be reversed because it was possible the jury did not find a specific intent to kill but rather based its verdict on a theory of implied malice. He bases his claim on the fact that the jury was instructed on second degree murder, which included an explanation of implied malice. (See *People* v. *Lee, supra,* 43 Cal.3d 666.) We reject the argument because the jury specifically convicted defendant of attempted *first* degree murder, not second degree murder, and the jury was told that the former offense required a specific intent to kill.

H. *Other Instructional Errors*

 Defendant claims the court erred in failing to instruct sua sponte that malice aforethought requires "an awareness [by the defendant] of a

duty imposed by law not to commit [the act] followed by the commission of the forbidden act despite that awareness." We rejected a similar argument in *People* v. *Cruz* (1980) 26 Cal.3d 233, 252-253 [162 Cal.Rptr. 1, 605 P.2d 830], holding that the failure to give such an instruction constitutes reversible error only if there is "evidence deserving of consideration that defendant lacked an awareness of that duty. [Citations.]" We further stated, "[w]ithout relevant evidence it is not reasonably probable that a result more favorable to defendant would have been reached had the instruction been given; and error, if any, was not prejudicial. [Citations.]" (*Id.*, at p. 253.) Here, the only possible evidence bearing on the issue was evidence of defendant's ingestion of drugs prior to the murders, yet there was no evidence whatever that the drugs affected defendant's awareness of his duty not to kill. The jury rejected defendant's claim of diminished capacity, and there is no other evidence in the record indicating that defendant lacked an awareness of the duty not to kill. Indeed, the record shows that defendant expressly declined "to kill any babies," evidencing an awareness of that duty.

■ In a related vein, defendant complains that the jury might have believed that he bore the burden of proving his diminished capacity to negate malice. The court instructed the jury, "[t]o establish the killing is murder and not manslaughter, *the burden is on the state to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel.*" (Italics added.) Defendant claims the instruction failed to inform the jury that the state also bore the burden of proving that defendant's ability to harbor malice was not negated by intoxication. We find no merit in the argument.

Defendant again fails to consider the instructions as a whole. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 830-831 [218 Cal.Rptr. 49, 705 P.2d 372].) The court, in addition to giving the above instruction, also informed the jury that the state bore the burden of proving guilt beyond a reasonable doubt. It further told the jury that: "If you find from the evidence that at the time the alleged crime was committed the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter. Thus, if you find that defendant's mental capacity was diminished to the extent that you have *a reasonable doubt* whether he did maturely and meaningfully premeditate, deliberate and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of willful, deliberate and premeditated murder of the first degree." (Italics added.)

The jury was further instructed that: "If from all the evidence you have *a reasonable doubt* whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent." (Italics added.) We also note that defense counsel explicitly told the jury that "The prosecution has to prove to you, beyond a reasonable doubt, that [defendant's] mind, his mental faculties, were [*sic*] not affected by . . . drugs."

We believe the instructions, taken as a whole, adequately informed the jury that the state bore the burden of proving beyond a reasonable doubt that defendant acted with malice and that he was not so intoxicated that he was unable to harbor the requisite intent. Under the instructions, the prosecution clearly bore the burden of convincing the jury beyond a reasonable doubt that, at the time of the murders, defendant was capable of forming, and in fact did form, the specific intent to kill.

## I. *Ineffective Counsel—Prosecutorial Misconduct*

Defendant claims his trial counsel was ineffective in failing to object to certain prosecutorial argument. Specifically, defendant points to counsel's failure to object to certain statements casting doubt upon his diminished capacity defense. First, the prosecutor expressed his doubt as to the applicability, under the evidence, of a diminished capacity defense in light of defendant's ability to "walk around, carry on a logical conversation, involve[] himself in a goal-oriented behavior." Second, according to the prosecutor, "This is not a crazed man on drugs whose mind is wiped out and who is involved in some irrational behavior" which might negate malice or an intent to kill. Finally, the prosecutor doubted that the drugs defendant ingested could have had any causal relationship with the murders. "In other words, no one has been able to say if you take this drug it's going to make you kill somebody." He did acknowledge, however, that under the instructions intoxication could reduce the degree of the crime if it resulted in "substantially reduced mental capacity."

It is well settled that a prosecutor may "vigorously argue his case" to the jury. (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 580.) Each of the foregoing statements was made to rebut defendant's claim of diminished capacity. The statements were proper in light of the circumstances in which they were made. The first two statements were fair comments on the evidence presented. The prosecutor found it difficult to believe that defendant was suffering from diminished capacity because he walked, talked, threatened, ordered, and murdered without ever indicating any objective signs of intoxication, lack of control, or lack of mental capacity. The prosecutor's statement was

merely a permissible application of the testimony of Belinda and Bennie to the law of diminished capacity.

Defendant asserts that the third statement misstated the law in that it suggested that there must be a " 'but for' relationship between the use of drugs and the killings." Defendant is in error. The prosecutor merely responded to the closing arguments made by defense counsel. His point was simple: defendant's use of drugs on the night of the murders would not preclude a finding that he deliberately, and with premeditation, committed a murder that evening. *Immediately* after making this argument, the prosecutor quoted the correct jury instructions on diminished capacity. Thus, we reject defendant's argument that the prosecutor's statements were either inaccurate or inflammatory. Accordingly, we need not consider defendant's claim of ineffective assistance of counsel in his failure to object to these statements.

### J. *Specific Intent to Kill*

Defendant asserts that the court erred in failing to instruct the jury that it must find a specific intent to kill in order to find the multiple-murder special circumstances true. He bases this contention on the following jury instruction: "If defendant Alfred Dyer was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to the defendant." He claims that giving this instruction was error under *People* v. *Turner, supra,* 37 Cal.3d 302, 328-329.

Defendant is mistaken. The defendant in *Turner* was convicted on a felony-murder theory and we were concerned that the jury might not have found that he intended to kill during the commission of the underlying felonies. Defendant Dyer, however, was tried on a theory of, and convicted of, deliberate and premeditated murder, *not* felony murder. *Turner* is therefore inapplicable. (See also *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], regarding the intent-to-kill element in a felony-murder context.)

## II. PENALTY PHASE

Defendant also raises several claims of error occurring during the penalty phase of his trial. We nonetheless conclude that the penalty should be affirmed.

## A. *Excessive Multiple-murder Special Circumstance*

■ Defendant alleges error in the charging, and consideration by the jury, of two multiple-murder special circumstances instead of one. We have held that "alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty, a result also inconsistent with the constitutional requirement that the capital sentencing procedure guide and focus the jury's objective consideration of the particularized circumstances of the offense and the individual offender." (*People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433], citation omitted; see also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) Accordingly, only one multiple-murder special circumstance should have been considered by the jury during the penalty phase.

The instructions, however, did not permit consideration of any evidence that was not otherwise admissible and relevant to the penalty decision. The jury was fully aware that defendant committed two murders in the present case, and that the multiple-murder special circumstances were based on these two murders. (See *Allen, supra,* at pp. 1181-1183.) Accordingly, we find the error harmless.

## B. *Evidence of Lesser Sentences for Ario and Jackson*

During the penalty phase, defendant sought to admit evidence of the lesser sentences imposed in the separate trials of Ario and Jackson: Ario received life imprisonment and Jackson received life without possibility of parole. Defendant sought to introduce this evidence as a mitigating factor to show that the other two participants in the murders did not receive a death sentence. In this way, he assertedly hoped to appeal to the jury's sense of justice and fairness and to obtain uniformity in sentences. The court ruled the evidence irrelevant.

■ "Under California law the prosecutor and the defendant may present evidence at the penalty phase relevant to aggravation and mitigation, including evidence of *defendant's* character, background, history, and mental condition. [Citation.] In addition, the federal Constitution requires that a defendant in a capital case be permitted to introduce any evidence relevant to *his* character or record as a mitigating factor. (*Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-112 [71 L.Ed.2d 1, 8-9, 102 S.Ct. 869]; *People* v. *Frierson* [(1979)] 25 Cal.3d 142, 178 [158 Cal.Rptr. 281, 599 P.2d 587].) In *Lockett,* the United States Supreme Court held that 'the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of

capital case, not be precluded from considering, as a mitigating factor, any aspect of a *defendant's* character or record and any of the circumstances *of the offense* that the defendant proffers as a basis for a sentence less than death.' (438 U.S. at p. 604 [57 L.Ed.2d at p. 990], fns. omitted, italics [deleted].)" (*People* v. *Harris, supra,* 36 Cal.3d 36, 68, italics added.)

 We believe the trial court was correct in finding the evidence irrelevant for it did not concern *defendant's* "character, background, history, [or] mental condition," nor did it shed light on the "circumstances of the offense." The jury did not know what different evidence, if any, was introduced against Ario or Jackson, nor did it know what defenses, if any, those defendants elected to assert. The jury was also unaware what matters Ario or Jackson introduced as mitigating evidence for purposes of sentencing. It is likely that there were substantial differences in the degree of culpability of these three men—indeed, the death penalty was not even sought against Ario. (Cf. *Buchanan* v. *Kentucky* (1987) 483 U.S. 402 [97 L.Ed.2d 336, 107 S.Ct. 2906] [*joint* trial permits assessment of relative responsibilities of multiple defendants].)

We find it difficult to see how the ultimate conclusions of the juries in Ario's and Jackson's cases could possibly be relevant without reviewing the entire guilt and penalty phases of their trials. Merely informing defendant's jury of the *sentences* the others received would add nothing of relevance to its penalty determination. Clearly, the fact that a different jury under different evidence, found that a different defendant should not be put to death is no more relevant than a finding that such a defendant should be sentenced to death.[1] Such evidence provides nothing more than incomplete, extraneous, and confusing information to a jury, which is then left to speculate: "Why did that jury do that? What was different in that case? What did that jury know that we do not know?"

As the North Carolina Supreme Court stated recently in a similar case: "The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. [Citation.] *The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense.* See *Lockett* v. *Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). *It bears no relevance to these factors, and thus there was*

---

[1] This case is not controlled by *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622], where we reversed the murder conviction of the driver of the getaway car in light of the acquittal of a confederate who actually participated in the robbery. Here, both defendant and Jackson were convicted of first degree murder as actual *shooters,* but the circumstances relevant to their punishment for the crime may well have significantly differed.

*no error in the judge's refusal to submit it to the jury.*" (*State* v. *Williams* (1982) 305 N.C. 656 [292 S.E.2d 243, 261-262], cert. den. 459 U.S. 1056 [74 L.Ed.2d 622, 103 S.Ct. 474], italics added; accord *Brogdon* v. *Blackburn* (5th Cir. 1986) 790 F.2d 1164, 1169, but see *Brookings* v. *State* (Fla. 1986) 495 So.2d 135, 143.)

Defendant provides no compelling reason why we should hold otherwise. The asserted "unfairness" arising from the fact that his brother's life was spared hardly seems a sufficient basis. Many other factors may account for the discrepancy between Jackson's and defendant's sentences: the prosecution's theory was that defendant was the dominant personality; the mitigating factors presented to the two juries obviously could have differed. Defendant's claim that the evidence was admissible to appeal to the jury's sense of justice or fairness is unconvincing. ▆ Although defendant is granted wide latitude in the evidence he may admit during the penalty phase of trial, the trial court still possesses "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the *defendant's* character, prior record, or the circumstances of the offense." (*Lockett* v. *Ohio* (1978) 438 U.S.586, 604, fn. 12 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], italics added.) ▆ Because the evidence defendant sought to admit was irrelevant, the court did not err in exercising discretion to exclude it.

Defendant also urges that we adopt a form of proportionality review whereby we would compare defendant's sentence with sentences imposed in similar cases. We have previously declined to do so (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113]), and we see no reason to reconsider that decision here.

C. *Improper Aggravating Evidence*

1. *Use of Defendant's Probation Report in Cross-examining Dr. Hilliard*

Defendant called Dr. Thomas O. Hilliard, Ph.D., a psychologist, to testify at his penalty trial as an expert witness. Dr. Hilliard had interviewed defendant and had sought out additional background information so that he could form an opinion as to defendant's sense of morality. He did not obtain a copy of defendant's probation report. The prosecutor provided Dr. Hilliard with a copy of that report and asked him to form an opinion based on some of the information that it contained. Defendant made no objection to either the use of the report or the prosecutor's question. ▆ Defendant now alleges that the report was hearsay and therefore inadmissible, but we conclude the argument has been waived. "Defendant is precluded from raising this issue on appeal by his failure to preserve the point by

appropriate objection in the trial court. (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].)" (*People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240].)

2. *Use of Defendant's Trial Testimony in Cross-examining Dr. Hilliard*

■■■ Defendant maintains that the court erred in permitting the prosecution to assume facts not in evidence in questioning Dr. Hilliard. Specifically, defendant asserts "[t]he government produced not a shred of evidence that [defendant] was taking drugs in the course of his duties as a bus driver for children at Head Start [where he worked at the time of the murders]." The prosecutor presented such evidence in the form of a hypothetical question by asking, "If you knew the person driving the bus at the Head Start School where your children [were] attending, and you knew that person was taking cocaine habitually, would you be concerned about your children?" Defendant objected on the grounds of lack of relevance and proper foundation, there being no evidence that defendant ingested cocaine while working. The court overruled both objections.

We believe the court was correct in both rulings. First, the question was highly relevant in light of Dr. Hilliard's repeated insistence that defendant had a strong moral sense. The prosecution's hypothetical question attempted to impeach or undermine Dr. Hilliard's opinion. Second, defendant had testified that he used cocaine habitually, and Dr. Hilliard admitted that he was aware defendant was using cocaine while employed at Head Start as a bus driver. The question was based on a reasonable inference from the evidence. Thus, the court properly overruled the objection that the hypothetical assumed facts not in evidence.

Finally, the court instructed the jury, "[i]n examining an expert witness counsel may propound to him a type of question known in the law as a hypothetical question. By such a question the witness is asked to assume to be true a set of facts and to give an opinion based on that assumption. In permitting such a question the Court *does not rule, and does not necessarily find, that all the assumed facts have been proved*. It only determines that those assumed facts are within the probable or possible range of the evidence. It is for you, the jury, to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved, and if you should find that any assumption in such a question has not been proved you are to determine the effect of that failure of proof on the value and weight of the expert opinion based on the assumed facts." (Italics added.) No error occurred here.

### 3. *Inflammatory Evidence*

 Finally, defendant complains of the admission (at the guilt phase) of various evidence, including two photographs, Floyd's bloodstained shirt and two handguns. Defendant provides only a bare assertion that these items had an inflammatory and prejudicial effect at the *penalty* phase; he gives no reasons to support the claim. Whether the probative value of evidence outweighs any inflammatory effect is generally left to the sound discretion of the trial court. (*People* v. *Salas* (1972) 7 Cal.3d 812, 819 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].) The court's finding will not be disturbed "absent a finding that the injury is of such gravity as to amount to a manifest miscarriage of justice." (*People* v. *Pena* (1984) 151 Cal.App.3d 462, 480 [198 Cal.Rptr. 819], citations omitted.) We find nothing in the record indicating such a miscarriage of justice.

First, the handguns were never formally introduced into evidence. The prosecutor explained that the guns were used "only for demonstrative purposes," and he did not move for their admission. Defendant accordingly withdrew his objection. As for the shirt, the court found it relevant because it was torn, and because a torn scrap of the shirt was found elsewhere, supporting an inference that Floyd had struggled before he was killed. Finally, the court found the photographs were not cumulative, were relevant, and were not likely to inflame the jury. It also found that the photograph of Floyd was "not gruesome." As we have stated, "Evidence Code section 352 vests the court with broad discretion to weigh the prejudicial effect of proffered evidence against its probative value. [Citation.] No abuse of that discretion appears: the photograph was not cumulative, and was highly relevant evidence on the issue of malice . . . . '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . .' " (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) Accordingly, we find the court did not err in admitting the shirt and the photographs.

### D. *Right to an Impartial Jury—Witherspoon Error*

 Defendant challenges the exclusion for cause of two prospective jurors—Davidson and Frazier—claiming that they did not unequivocally state they would have automatically voted for life without possibility of parole. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) The review standard cited by defendant was substantially modified by *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], which simply inquires "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " We adopted the foregoing *Witt*

standard in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250]. Whether the *Witherspoon* or *Witt* standard is used, however, it is clear the prospective jurors were properly excused in this case.

Thus, prospective juror Davidson began by stating that he "probably could not vote in favor of the death penalty," but he later elaborated on his response, stating "I probably wouldn't, no. *I cannot vote for the death penalty.*" When asked, "You cannot vote [for it]," he replied, "*I cannot vote for it.*" (Italics added.)

Prospective juror Frazier initially indicated that he would consider both penalties, but several days later he explained to the court that he had read a newspaper article on the death penalty and had spoken with his sister, who had recently completed serving on a jury in a capital case. According to Frazier, "I don't think I have an open mind any more." The court inquired whether he would "automatically in every case vote for life without possibility of parole?" Frazier responded that "*I would be automatically voting probably against the death penalty.*" When asked by the court, "Is it probably or is it yes," Frazier answered "Yes."

While it is true that the responses of both Davidson and Frazier were somewhat ambiguous, the record clearly shows that, when the question was put to them in its most direct form, both persons stated they would be unable to impose the death sentence.

The trial court is in a better position than this court to evaluate the responses of a prospective juror. It is common for a prospective juror to initially give equivocal answers and then, once questions are put that focus the issue and force the prospective juror to think about whether they could actually impose such a sentence, indicate that they will never vote for the death penalty. (See e.g., *People* v. *Fields* (1983) 35 Cal.3d 329, 353-357 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64].) We find no error in the court's exclusion of prospective jurors who indicated they would not, under any circumstances, vote for the death penalty.

E. *Constitutionality of the 1978 Death Penalty Law and Sentencing Scheme*

Defendant asserts that the 1978 death penalty law is defective in failing to (1) specifically enumerate aggravating and mitigating factors; (2) provide a "finite list of permissible factors to be considered in aggravation" (3) require written findings on aggravating factors; (4) require jury unanimity on aggravating factors; and (5) require a jury finding that, beyond a reasonable

doubt, death should be imposed. Similar challenges were made and rejected in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779, and cases cited therein.

### F. *Improper Instructions at Penalty Phase*

Defendant raises several claims of instructional error during the penalty phase. Our review of the record reveals no prejudicial error.

#### 1. *Defendant's Prior Acts of "Force or Violence"*

The court instructed the jury in the language of section 190.3, factor (b), which allows the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." ▮▮▮ The thrust of defendant's present argument is that the prosecution never proved to the jury that defendant used a gun during the prior armed robbery for which he was convicted. The claim lacks merit.

Defendant *stipulated* that the alleged prior conviction for armed robbery, with a firearm use allegation, was true. Because of the stipulation, the prosecution did not introduce the facts surrounding the offense. In addition, the court took judicial notice of the fact, reflected in the abstract of judgment, that defendant was armed with and used a gun in the commission of the robbery. Accordingly, the court informed the jury that "the defendant . . . was convicted of having used a firearm, as well as having been armed with a firearm." He subsequently instructed the jury, "I have . . . previously advised you, as jurors, that the Court took judicial notice on the occasion of the armed robbery that the defendant . . . used a firearm."

Defendant relies on his attorney's attempt to modify the stipulation. Defense counsel admitted to the court that he had stipulated to the firearm-use finding, but that, "after having thought it through clearly, it was not my desire to stipulate that as an aggravating factor my client had used a weapon." The trial court refused to modify the stipulation. We agree that the court's ruling was proper for two reasons: First, counsel had entered into that stipulation months earlier and the penalty phase—except for instructions and summing up—had been virtually completed. The prosecution had relied upon the stipulation and had waived its right to present the evidence underlying the prior conviction. Second, regardless of the stipulation, the court could take judicial notice that defendant used a firearm in the commission of the armed robbery. We therefore find no error in giving the jury the opportunity to weigh defendant's prior use of a firearm as a factor in aggravation.

### 2. *Consideration of Unadjudicated Prior Criminal Acts*

Guilt phase evidence indicated that defendant, an ex-felon, may have (1) possessed a firearm on the day before the murders, and (2) used and sold drugs. Although the People did not attempt to characterize this nonviolent crime evidence as an aggravating circumstance (see § 190.3, factor. (b)), at defendant's request the court instructed the jury that such "unconvicted crimes" could not be considered unless proved beyond a reasonable doubt.

 Defendant now contends that jury consideration of unadjudicated prior crimes is constitutionally improper, an argument we rejected in *People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480]. Defendant also argues the trial court, sua sponte, should have instructed regarding the essential elements of defendant's prior crimes, a contention rejected in *People* v. *Ghent, supra,* 43 Cal.3d 739, 773. We find no reason for reconsidering those rulings here. In any event, under the circumstances, it is very unlikely the jury relied on defendant's unadjudicated offenses in reaching its penalty decision.

### 3. *Aggravating Factors Falling Within More Than One Subdivision*

 Defendant contends that the trial court erred in instructing the jury in the language of section 190.3 (CALJIC No. 8.84.2, factor (b)) because certain circumstances in aggravation might have fallen within more than one factor, resulting in their being considered by the jury as more than one factor in aggravation.

The court instructed the jury, "You shall consider, take into account and be guided by the following factors, if applicable: (a) the circumstances of the crime of which the defendant was convicted in the present proceeding, and the existence of any Special Circumstances found to be true, (b) the presence or absence of criminal activity by the defendant which involved the use or attempted use, of force or violence, or the expressed or implied threat to use force or violence, (c) the presence or absence of any prior felony convictions . . . ." Defendant maintains that since the instruction does not make it clear that subdivisions (b) and (c) refer to criminal activity or felony convictions other than the present offenses, the jury might have considered defendant's murder of Nora as an aggravating factor under all three subdivisions.

We have recently held that it would be "improper for the jury to consider the underlying crimes as separate and distinct aggravating circumstances under either subdivision," but we concluded that, as in the present case, "there is absolutely no indication that the jury would have understood that

the guilt phase crimes came within subdivision (b) or (c)." (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 106 [241 Cal.Rptr. 594, 744 P.2d 1127].)

The trial court minimized the likelihood of confusion by further instructing the jury that "You must not decide the issue of the appropriate penalty by simply counting the number of aggravating versus mitigating circumstances. Instead, you must weigh the varying circumstances. You may impose a penalty of death only where the aggravating circumstances outweigh the mitigating circumstances." It is clear that the murder of Nora was but one of the "varying circumstances" the jury could weigh. We therefore conclude that the jury was not misled by the court's instructions as to section 190.3.

### 4. *Jury Consideration of Nonstatutory Aggravating Factors*

 Defendant also challenges a special jury instruction which supplemented the standard instructions by defining the term "aggravating circumstance." He asserts that the court failed to instruct the jury to limit its application of this definition to "those aggravating factors specifically set forth under Penal Code section 190.3 (a)-(k)." (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-776 [215 Cal.Rptr. 1, 700 P.2d 782].)

During discussions on what jury instructions would be given, the prosecutor objected to a proposed defense instruction defining "mitigating" evidence because "it only talks about mitigating circumstances. It does not contain a definition of aggravation and aggravated circumstances. And it would seem to me that that's just basic: If you're giving a definition of mitigated [*sic*] you certainly should be giving a definition of aggravation." The court and the prosecutor agreed, over defense counsel's objection, that Black's Law Dictionary would provide a suitable definition for aggravating circumstances.

Accordingly, the court instructed the jury as follows: "¶ You are instructed that an aggravating circumstance is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the offense itself. ¶ You are instructed that a mitigating circumstance is any fact, condition or event which, as such, does not constitute a justification or excuse for the offense in question, but which may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. ¶ It will be your duty . . . to determine which of the two penalties . . . shall be imposed on the defendant. After having heard and considered the arguments of counsel, *you shall consider, take into account*

*and be guided by the applicable factors of aggravating and mitigating cir-cumstances upon which you have been instructed.*" (Italics added.)

The foregoing definitions of aggravation and mitigation provided a help-ful framework within which the jury could consider the specific circum-stances in aggravation and mitigation set forth in section 190.3. We find no error in the presentation of both definitions to the jury, and we find no prejudice in light of the instruction limiting the jury's consideration to "the applicable factors of aggravati[on]."

### 5. *Failure to Instruct the Jury to Consider Defendant's Character and Background as Circumstances in Mitigation*

The court instructed the jury, pursuant to former CALJIC No. 8.84.1, that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial in this case. You shall consider, take into account, and be guided by . . . any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." ██ Relying on our prior decisions, defendant maintains this instruction was insufficient to explain to the jury that it could properly consider his character and background evi-dence as potentially mitigating circumstances. (See e.g., *People* v. *Davenport* (1985) 41 Cal.3d 247, 282-286 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813] [requiring more explicit instructions in future cases].)

Defendant reasons as follows: 1) although the jury was instructed to consider "all of the evidence which has been received during any part of the trial of this case," 2) the jury then heard a list of "factors" which it should "consider, take into account, and be guided by," and therefore (3) "a rea-sonable juror might interpret [the instruction as requiring] . . . that the evidence [of defendant's character and background] was to be considered only as it bore upon the enumerated factors . . . ." Defendant again fails to consider the jury instructions as a whole.

Prior to the calling of the first witness at the penalty phase, the court instructed the jury that, "in the proceedings on the question of penalty, evidence may be presented by both the People and the defendant as to any matter relevant to aggravation, mitigation and sentence including . . . *the defendant's character, background, history, mental condition and physical condition.*" (Italics added.) In addition, in a supplement to the standard instructions, the court advised the jury that it may consider "pity, sympa-thy, or mercy" in deciding the penalty. Finally, a review of the penalty phase arguments confirms that the jury was well aware that it was to

consider evidence of defendant's character and background as circumstances in mitigation.

During his opening statement at the penalty phase, defense counsel stressed that, "we plan to introduce evidence particularly as to the background of [defendant]," which included evidence of defendant's character. The defense proceeded to call several witnesses, each of whom spoke solely to the issue of defendant's background and character.

In closing argument, the prosecutor impliedly agreed the jury should consider such evidence, but he claimed it was unpersuasive. The prosecutor never suggested, however, that the jury could not consider sympathy and pity in deciding defendant's sentence.

Thus, the prosecutor commented upon the various statutory aggravating and mitigating factors, and then stated: "Any other circumstances which extenuate the gravity of the crime, even though it is not a legal excuse for the crime. We have looked over the evidence in this case, heard the witnesses testify, and we just can't think of any circumstances which extenuate the gravity of this crime." A reasonable juror would understand this remark as merely expressing the prosecutor's own view of the evidence, and not as a suggestion that defendant's evidence was legally irrelevant.

Defense counsel, in closing, argued to the jury that defendant's character and background warranted a sentence of life without possibility of parole. He also reminded the jury that "[t]he Judge gave you an instruction that said that you can in fact consider sympathy, pity, passion, and a whole source of factors in considering the sentence to impose" and he asked the jury to "be merciful."

We therefore reject defendant's claim that the jury might have mistakenly believed it was precluded from considering defendant's character and background in determining sentence. The defense focused on defendant's social environment, and both the prosecution and defense in closing argument debated the significance of defendant's background. In addition, the jury was informed that it could consider sympathy for defendant in determining penalty. It was thus made clear to the jury that defendant's character and background were to be evaluated.

6. *The Constitutionality of Section 190.3, Factor (d)*

Defendant next contends the instructions precluded the jury from considering mental or emotional disturbance as a mitigating circumstance unless

such disturbance was "extreme." We have rejected this claim in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776.

### 7. *Failure to Instruct Sua Sponte on the Difference Between "Impaired Capacity" and "Diminished Capacity"*

At the guilt phase, the court instructed the jury that, "[i]f you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter." At the penalty phase, the court instructed the jury that it may consider as a mitigating factor "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was impaired as a result of mental disease or defect, or the effects of intoxication."

■■■ Defendant contends that, since the former instruction addressed *substantially reduced* capacity while the latter addresses *impaired* capacity, the jury might have thought that it could not have considered evidence of defendant's impaired capacity in determining his penalty. The argument is meritless. The jury was instructed on diminished capacity at the *guilt* trial, and it was instructed on impaired capacity at the *penalty* trial. In light of the chronology of the instructions, the jury knew that it could consider evidence of defendant's impaired mental capacity in determining penalty, even though it had earlier rejected his diminished capacity defense. We are unpersuaded that trial courts must sua sponte inform the jury of the difference between the two instructions.

### 8. *Failure to Delete Assertedly Inapplicable Mitigating Factors*

■■■ Defendant observes that CALJIC No. 8.84.1—which incorporates section 190.3, factors (a) through (k)—was read to the jury in its entirety. He contends that "[t]his allowed the absence of evidence on inapplicable mitigating factors to become, in effect, a factor in aggravation." We have rejected this claim in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777. The jury was specifically instructed to consider only those factors which it found applicable. Defendant could only have benefited by the court's failure to remove a potentially mitigating factor from the jury's consideration.

## G. *Asserted Prosecutorial Misconduct*

### 1. *Remarks Concerning Defendant's Potential for Future Violence*

■ Defendant asserts that the prosecutor committed misconduct when he argued to the jury that defendant might kill again if sent to prison. During the penalty phase, the prosecutor asked defendant's expert witness (a clinical and forensic psychologist) whether defendant would be violent in prison. Defendant did not object to the question, and the witness eventually gave his opinion that he doubted defendant would cause trouble in prison. In closing argument, the prosecutor argued to the contrary.

Defendant now points to our observation in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446], that "[o]ne can imagine few matters more prejudicial at the penalty trial than testimony from an established and credentialed expert that defendant, if sentenced to life without possibility of parole, would be likely to kill again." From this, defendant suggests that the prosecution's questions regarding defendant's violent disposition were equally prejudicial in this case, and the suggestion of future dangerousness was improper. Defendant's claim lacks merit.

First, defendant failed to object to the prosecutor's argument and is therefore precluded from challenging it on appeal. (See *People* v. *Green*, (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

Second, defendant's reliance upon *Murtishaw* is misplaced. There, at the penalty phase, the prosecutor called an expert witness who testified, over objection, that "defendant would continue to be a violent and assaultive person in prison, reacting to frustration with physical aggression, and could show the 'same types of homicidal tendencies that he has shown in the past.'" (29 Cal.3d at pp. 748-749, quoting record.) We held that, "[i]n view of the unreliability of that forecast . . . the probative value of that testimony is far outweighed by its prejudicial impact." (*Id.*, at p. 773.) We recently distinguished *Murtishaw*, observing that there "our primary concern was that expert opinion on the subject of defendant's propensity to commit violence is unreliable and frequently erroneous and often carries great weight with the jury. [Citation.] We do not believe a prosecutor's comments during closing arguments present the same potential for prejudice." (*People* v. *Miranda, supra*, 44 Cal.3d 57, 111; see *People* v. *Davenport, supra*, 41 Cal.3d 247, 288.)

### 2. *Remarks Concerning Lack of Remorse*

■ Defendant also cites as prosecutorial misconduct the statement, during closing argument, that "you haven't heard one person get on this

stand and say that Alfred Dyer killed these people, that he broke down and cried about it, saying, 'I'm sorry Floyd Murray got shot. I'm sorry I shot Belinda. I'm sorry I shot Nora Fluker,' or 'I'm sorry I shot Bennie.' You haven't heard one person say that. If you came in this courtroom and no one told you any different, and you looked over at the defense table, you would think you have three lawyers sitting there. That's what you'd think. You don't see a person drooped over the chair with tears running down his face, or somebody who's impoverished who never had a chance in life. He is not there." Defendant contends that this constituted impermissible reference to lack of remorse.

We first note that defendant failed to object to the prosecutor's statements and is therefore precluded from challenging them on appeal because "any harm flowing therefrom could have been cured by appropriate admonition . . . ." (*People* v. *Green, supra,* 27 Cal.3d 1, 25, 27.) "The reason for this rule, of course, is that, 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' [Citations.]" (*Id.,* at p. 27.)

Turning to the merits, defendant's contention must fail. In *People* v. *Ghent, supra,* 43 Cal.3d 739, 771, we observed that "[t]he concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal. The prosecutor's argument here merely demonstrated the absence of that particular mitigating factor. [Citations.]"

Although *Ghent* arose under the 1977 death penalty law, we think its reasoning applies with equal force to the present case, tried under the 1978 law. Both laws require the jury to weigh the aggravating and mitigating factors in deciding the penalty issue. Under both sentencing procedures, the prosecutor should be entitled to observe that a particular mitigating circumstance, such as the defendant's remorse for his victims, is lacking from the case. (Accord, *People* v. *Miranda, supra,* 44 Cal.3d 57, 112.) Of course, the prosecutor is not permitted to argue that the absence of such mitigating factors is itself an *aggravating* factor justifying the death penalty (see *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290). No such argument was made here.

### 3. *Remarks Concerning Impact on Victims' Relatives*

■ Defendant also contends that the prosecutor resorted to improper and inflammatory tactics during closing argument when he argued that, "[Nora and Floyd] were our fellow creatures . . . . [T]heir lives were just as important to their mothers, their parents, their sisters and brothers, as

anyone else's, and under the circumstances where they were murdered there was no justification for it whatsoever. So we're going to ask you, as jurors, to consider all the evidence in this case, evidence from the guilt phase where you made your determination; look at the victims in the case, and be fair to them."

The question arises whether the foregoing remarks were inappropriate under the rule in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], which bars admission of victims' impact statements at the penalty phase. Although *Booth,* involving presentation of formal *evidence* rather than mere argument, is "patently distinguishable" (*People* v. *Miranda, supra,* 44 Cal.3d 57, 113), in any event the prosecutor's remarks here were brief and mild, and could not have affected the verdict. (See *People* v. *Ghent, supra,* 43 Cal.3d 739, 771-772.)

### 4. *Alleged Improper Argument Regarding Mitigating Factors*

The court instructed the jury, pursuant to former CALJIC No. 8.84.1, on the factors contained in section 190.3, telling it to consider only those that are relevant. The prosecutor examined the list and commented that many of the factors were "not applicable." As for the "catchall" provision, factor (k), the prosecutor argued: "Any other circumstances which extenuate the gravity of the crime, even though it is not a legal excuse for the crime. We have looked over the evidence in this case, heard the witnesses testify, and we just can't think of any circumstances which extenuate the gravity of this crime."

■■ Defendant insists that these comments were "condemned" in *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-289. In *Davenport,* we found error in prosecutorial argument that the absence of a potentially mitigating factor constituted an aggravating factor. *Davenport* is clearly distinguishable from the case before us. Indeed, defendant concedes that the prosecution "never expressly argued the absence of mitigation equals aggravation." It is plain that the prosecutor was simply arguing that certain mitigating factors were not present; he was not trying to imply that such absence could be considered in aggravation, nor were the statements confusing to the jury. The quoted statements to which defendant objects constitute nothing more than proper prosecutorial argument. (Cf. *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789-790.)

### H. *The Adequacy of the Section 190.4, Subdivision (e), Hearing*

Following a jury verdict of death, an application for modification of the judgment was made to the trial court. (§ 190.4, subd. (e).) "In ruling on the

application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in section 190.3." (*Ibid*.) The court in the present case recognized that it bore the "responsibility to make an independent determination as to whether the jury's verdicts and findings that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." Defendant asserts that the trial court failed to consider sympathy as a factor in mitigation. We disagree.

Defendant focuses on the following statement by the court: "Many of [the letters sent on defendant's behalf] were pleas for mercy, some added matters having to do with the background of the defendant as a helpful, diligent, caring kind of person of persons close to him, members of his family, fellow workers, et cetera. It is not my responsibility, however, to act upon mercy." Read in the context of the entire record, we conclude that the court's reference to a lack of authority to exercise mercy did not demonstrate any misunderstanding of its role, for the court's remarks disclosed that it understood it could consider "sympathy" considerations in making its decision.

The court explained that its ruling regarding modification of the sentence "is to be undertaken without being arbitrary, and in accordance with the dictates of the law as to what's allowed for this court to do." The court stated, "I considered every scrap of evidence that has come to my disposal by way of the trial evidence, by way of the arguments of counsel . . . I have carefully considered this matter both as an individual, as the head of a family, as the father of children, indeed, as a black person looking out to see that [defendant] is black and that he comes from a black family, and with some acquaintanceship with drugs and their . . . [e]ffects and likely [e]ffects upon individual human beings." The court also explained that "the court is not required simply to look at the crime itself in imposing any sentence of any kind whatsoever, but also is required . . . to look at the surrounding social circumstances that appear, from whatever source, that would warrant or justify a penalty by the court or punishment by the court or conduct by the court that takes into account both the crime and the surrounding circumstances as to the individual involved. And I've done that."

In light of the entire record, we believe that the court was well aware of its duty to consider "pity, sympathy or mercy"; the court specifically instructed the jury that such matters were proper sentencing considerations. We believe the court carefully weighed all of the factors in mitigation but concluded that the aggravating circumstances still outweighed the mitigating circumstances. We find no error in the court's ruling.

## CONCLUSION

The judgment of guilt, the finding of one multiple-murder special circumstance, and the judgment of death are affirmed.

Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied June 9, 1988.