Filed 12/19/13  P. v. Marshall CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238476 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078110) |
| v. | |
| JIMMY RAY MARSHALL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor and Steven R. Vansicklen, Judges.  Affirmed.

Esther K. Hong, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Jimmy Ray Marshall, appeals his conviction for possession of a firearm by a felon, with two prior prison term enhancements (Pen. Code, §§ 12021 [former], 667.5).[1] He was sentenced to state prison for a term of two years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On May 18, 2010, at about 11:30 p.m., Los Angeles County Sheriff's Deputy Paz was in a marked patrol car with his partner, Deputy Lumpkin. They saw defendant Marshall riding a bicycle without a light or a helmet. Paz pointed his spotlight at Marshall, who immediately jumped off the bike and raised his hands. Marshall then grabbed his waistband and started running.

Paz and Lumpkin left the patrol car and chased Marshall on foot. As Marshall crossed the intersection of Budlong Avenue and 92nd Street, he pulled a handgun from his waist and tossed it in the direction of a wrought iron fence; Paz saw the gun hit the fence and land on the ground. Paz soon quit the chase after Marshall climbed over a chain-link fence, and Paz then retraced his steps the 20 to 25 feet to where he had seen Marshall throw the handgun. He found the gun, a chrome nine-millimeter; its magazine was loaded and there was a bullet in the chamber.

Paz established a containment area and called for a canine unit. Deputy Phillippi and his dog Kai searched the area and found Marshall hiding underneath a vehicle inside a carport. Phillippi announced his presence and warned that the dog would bite. He waited five or ten seconds and then let Kai loose. There followed a struggle between Marshall and the dog, during which Marshall kicked the dog in the head and the dog bit

---

[1] All further references are to the Penal Code unless otherwise specified.

Marshall.  The dog eventually dragged Marshall out from under the car.  Marshall's jeans were torn up, his face was bleeding, and the dog had bitten off a portion of his ear.

Deputy Phillippi testified he did not see or hear Marshall trying to surrender before he released the dog.  When Phillippi heard someone struggling with the dog, he called out for the suspect to give up but nothing happened.  Then he saw Marshall kicking the dog and the dog pulling Marshall out from under the car.  Phillippi denied having subsequently kicked Marshall in the face.

2. *Defense evidence.*

Marshall testified that on the night of the incident he was riding his bicycle without a helmet and his bike-light was not working.  A police car suddenly pulled in front of him and cut him off.  Marshall immediately put his hands up to signal that he wasn't armed.  The officers jumped out of the patrol car with guns drawn and told him to get off the bike.  Marshall panicked and started to run because he had an outstanding arrest warrant for a traffic ticket.  He grabbed his waistband because he was wearing baggy pants and he had to pull them up in order to run.  He denied having a gun in his possession.  He saw a gate, hopped over it, and then hid under a vehicle inside a carport.

Marshall subsequently saw a helicopter hovering over the area and he heard public address warnings about a canine unit.  Later, he heard an officer's warning that he was about to send in the dog.  Marshall testified he tried to surrender but the officer unleashed the dog anyway.  The dog grabbed him by the back of his head and pulled him from underneath the car.  Deputy Phillippi then kicked Marshall in the face and the dog bit Marshall's ear.  Even after Marshall had been detained, the dog bit his legs.  Marshall testified: "So . . . I was being beat, I was being hit and kicked and punched by the officer with the dog and the dog itself."  He lost an ear.

**CONTENTIONS**

1. The trial court erred by denying Marshall's *Wheeler/Batson* motion.

2. The trial court erred by allowing impeachment with two prior convictions in violation of a stipulation.

3. This court should determine if *Pitchess* discovery was properly made.

3

# DISCUSSION

1. *Trial court did not commit Wheeler/Batson error.*

Marshall contends the trial court erred when it denied his motion alleging the prosecutor had improperly used a peremptory challenge against an African-American prospective juror. This claim is meritless.

a. *Legal principles.*

"A party [commits error under *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712], and *People v. Wheeler* (1978) 22 Cal.3d 258, by using] peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*People v. Fuentes* (1991) 54 Cal.3d 707, 713.)

"The United States Supreme Court . . . [has set forth] the applicable legal standards. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' [Citations.] [¶] In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.' [Citation.] The high court . . . explained that 'a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 186.)

4

"In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias [citation], the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative. [¶] For example, a prosecutor may fear bias . . . because [a juror's] clothes or hair length suggest an unconventional lifestyle." (*People v. Wheeler, supra*, 22 Cal.3d at p. 275.) "Because *Wheeler* motions call upon trial judges' personal observation, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm. [Citation.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

b. *Background.*

The trial court asked the panel of prospective jurors, "[H]ave you ever been arrested or anyone close to you ever been arrested?" Prospective Juror No. 6131 answered: "Years ago I got a DUI and years ago I was arrested for domestic violence, but I wasn't convicted of it." When the trial court asked if the domestic violence arrest had been a good or bad experience, the prospective juror answered: "[W]ell, it got reduced to disturbing the peace but I wasn't guilty, but I had to do some courses. But at first I was a little angry about it. I had to do the anger management, but at the end of it, it helped. So I turned it around and used it to my advantage." The prospective juror said he would not hold a grudge against either side in this case and that he would be able to treat a law enforcement witness the same as anyone else.

Later, during voir dire questions from the attorneys, the following colloquy occurred:

"[The prosecutor]: . . . [Y]ou mentioned you had . . . arrests for domestic violence and for DUI. The DUI . . . , did you plead to that or what ended up happening with that?

"[Prospective Juror No. 6131]: I pled to that.

"[The prosecutor]: Did you plead to it because you felt like you should or bad advice or what was your –

5

"[Prospective Juror No. 6131]: I was young at the time and it was advice.

"[The prosecutor]: Did you think you were under the influence at the time?

"[Prospective Juror No. 6131]: No."

During a subsequent sidebar discussion regarding a different prospective juror, defense counsel said, "Your Honor . . . if [the prosecutor is] going to kick [Prospective Juror No. 6131], he's the only African-American in the panel. So I would make a *Wheeler* motion based on that." The prosecutor responded by offering her reasoning: "[H]e said he was angry about getting that 415 [i.e., Penal Code section 415 (disturbing the peace)]. He did try to turn it around to a positive and then, when I asked him about the DUI, he said he didn't seem to get the DUI, so he doesn't seem to take responsibility and that's the basis for it."

The trial court had Prospective Juror No. 6131 come into chambers for further questioning. The following colloquy occurred:

"[The prosecutor]: . . . I'm going to go back to the DUI. You didn't feel you were under the influence. Did you feel that the officer unfairly pulled you over?

"[Prospective Juror No. 6131]: Well, it was a yellow light and late at night and it was just a weird situation . . . .

. . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . .

"[The prosecutor]: Did you feel that the officer was unfairly targeting you because it was just a yellow light?

"[Prospective Juror No. 6131]: No, I don't think it was unfair. It was questionable about the stop because, you know, 'it was a yellow light; you stopped me; I was getting on the freeway.' That never came up so. [¶] And then I had a couple of beers unopened in the backseat, so it went to that instead of why I was originally stopped.

"[The prosecutor]: Did you feel that you were treated fairly by the court system or that you had no choice?

"[Prospective Juror No. 6131]: I really didn't go through it. I just kind of did a no contest mainly because I didn't want to fight.

6

"[The prosecutor]: But did you feel you were in fact driving under the influence?

"[Prospective Juror No. 6131]: I had drinks.

"[The prosecutor]: The statute of limitations has run so we are not reopening your case. But you didn't think that you had broken the law?

"[Prospective Juror No. 6131]: Well, it was borderline because the BAC [blood alcohol concentration] was like right there.

"[The prosecutor]: On the cusps?

"[Prospective Juror No. 6131]: Right.

"[The prosecutor]: With respect to the domestic violence mentioned, you said that was disturbing the peace?

"[Prospective Juror No. 6131]: Yeah, it was reduced to that.

"[The prosecutor]: About how long ago was that?

"[Prospective Juror No. 6131]: That was probably about ten, eleven years ago.

"[The prosecutor]: Did you feel you were treated fairly in that situation by the police or –

"[Prospective Juror No. 6131]: No. No, I was not.

"[The prosecutor]: Is there anything about that experience that makes you a little still thinking about it even though you said you turned the anger management into a positive thing, you still feel you got the short end of the stick on that?

"[Prospective Juror No. 6131]: There's a question about my spouse at the time because it was her doing.

"[The prosecutor]: Were you more angry at her or the police for arresting you?

"[Prospective Juror No. 6131]: At her.

. . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . .

"[The prosecutor]: Did you feel the police were treating you fairly or just reacting?

"[Prospective Juror No. 6131]: I think they were reacting to her report.

"[The prosecutor]: Looking back at it now. . . do you understand why they did what they did or do you feel like they should have done better and not rush to judgment?

"[Prospective Juror No. 6131]: I felt they could have done a better investigation. One, by allowing me to state what happened which I didn't get a chance to do. And . . . it was just a bad situation. That's what I would say, a bad situation."

He also said the officers "were just trying to do their job. . . . [I]t was after the OJ Simpson thing, so it was a hot topic and they were doing what they . . . thought was right." He told the trial court that, even with all these experiences, he felt he could be fair to both sides.

After Prospective Juror No. 6131 left chambers, the prosecutor said: "Again, he is still not accepting responsibility. He feels that the police didn't listen to him [when] he was pulled over. It was questionable . . . if he was under the influence. He is just not taking responsibility." Defense counsel argued, "From his statements I don't think he says they were completely wrong, targeted for no reason. He said it's a close call. I don't think he is not taking responsibility. I think he is being truthful, as a lot of people don't understand the process."

After the trial court ruled the defense had made out a prima facie case of *Wheeler* error, the prosecutor argued: "[T]he People are not picking on [Prospective Juror No. 6131] because of his race. He made clear statements that he felt like the police didn't listen to him in the domestic violence case. He felt like he had done nothing wrong and he just plead [*sic*] to a charge. He is not taking responsibility. It was his wife or ex-wife that put this on him. The police didn't listen to him. He . . . felt he was never wrong in the first place even though it was a reduced charge. [¶] With respect to the driving under the influence case, he said he just ran a yellow light. It was questionable. No one ever challenged it. There was beer in the car, but he was on the border of being under the influence. He's just not taking responsibility. [¶] . . . [¶] . . . I do think that he would not necessarily be a fair juror despite what he was saying." "[I]n my experience, whether people are comfortable articulating [it] or not, if they feel that a case was put on them . . . that they didn't feel they were guilty, there is underlying resentment, whether they are

8

going to articulate it or not, towards law enforcement and the prosecution. And that's just been my general experience with jurors."

The trial court then denied Marshall's *Wheeler/Batson* motion.

c. *Discussion*.

Marshall contends the trial court did not adequately scrutinize the prosecutor's explanations because it failed to compare Prospective Juror No. 6131 with similarly situated prospective jurors who were not challenged. He argues: "While the prosecutor stated that she would keep a prospective juror who accepted responsibility for prior crimes, but would not do so for prospective jurors who did not, prior to the defense's *Wheeler* motion, she *only* asked Prospective Juror No. 6131 about his experience with past crimes. In other words, she did not follow-up with any other prospective juror who had prior convictions or criminal histories about whether they took responsibility for their actions or what their experiences with law enforcement or prosecution were like." Marshall asserts prospective Jurors No. 1719 and No. 5239 were the only ones other than prospective Juror No. 6131 who had been arrested, yet the prosecutor did not ask them about accepting responsibility and did not challenge either of them.

As we shall explain, Marshall's claim is meritless.

(1) *Legal principles: comparative juror analysis.*

The United States Supreme Court has approved the use of comparative juror analysis. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 [125 S.Ct. 2317].) However, the court has also recognized a basic limitation: "We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 483 [128 S.Ct. 1203].)

9

In *People v. Lenix* (2008) 44 Cal.4th 602, our Supreme Court said: "Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler/Batson*'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons. In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*Id*. at p. 607.)

(2) *Trial court properly denied the <u>Wheeler/Batson</u> motion.*

" 'One of the most regular uses of peremptory strikes is to eliminate from the final jury venirepersons whom either side believes will be too sympathetic to his opponent.' [Citation.]" (*People v. Dunn* (1995) 40 Cal.App.4th 1039, 1054.) And one of the most common situations giving rise to such suspected bias, and therefore justifying a peremptory challenge, is a negative encounter with the criminal justice system experienced either by the prospective juror personally, or by a relative or close friend. (See, e.g., *People v. Williams* (2006) 40 Cal.4th 287, 311 [DUI conviction]; *People v. Panah* (2005) 35 Cal.4th 395, 441-442 [arrest of juror or relative]; *People v. Gray, supra,* 37 Cal.4th at p. 192 ["someone close" to juror arrested and sent to jail]; *People v. Farnam* (2002) 28 Cal.4th 107, 138 [nephew incarcerated]; *People v. Dunn, supra,* 40 Cal.App.4th at p. 1049 [uncle convicted of murder].)

In this case, the record demonstrates the prosecutor's legitimate concern was that Prospective Juror No. 6131 might have lingering resentment arising from the DUI and domestic violence incidents. As for "acceptance of responsibility," the prosecutor clearly indicated this was merely one factor for gauging the possible extent of Prospective Juror No. 6131's bias. Marshall cites two cases where comparative juror analysis showed that a prosecutor's stated reasons for challenging a prospective juror were pretextual. Neither case is apposite.

In *Miller-El v. Dretke, supra,* 545 U.S. 231, a death penalty case, the prosecution used peremptory strikes "to exclude 91% of the eligible African American venire members." (*Id*. at p. 241.) "More powerful than these bare statistics, however, [were] side-by-side comparisons of some black venire panelists who were struck and white

10

panelists allowed to serve." (*Ibid.*)  This interjuror comparison showed the prosecution rejecting a black prospective juror who was apparently ideal, in terms of a juror's willingness to impose the death penalty, both by mischaracterizing the juror's views on the subject of potential rehabilitation and by ignoring responses given by white prospective jurors:  "If, indeed, Fields's thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no evident reservations." (*Id*. at p. 244.)[2]  Moreover, "the appearance of discrimination is confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected." (*Id*. at p. 253.)

In *United States v. Williamson* (5th Cir. 2008) 533 F.3d 269, a drug case, the trial court asked the panel of prospective jurors if " 'any member of the panel had any experience involving yourself, any member of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics?' In response . . . thirteen members of the venire – including the only two black venire members – responded that they, a family member, or a close friend had some drug involvement." (*Id*. at p. 271, fn. omitted.)  "The court allowed the parties to ask follow-up questions.  The Government

---

[2]     To cite only two of the examples noted by *Miller-El*:  "Sandra Hearn said that she believed in the death penalty 'if a criminal cannot be rehabilitated and continues to commit the same type of crime.' [Citation.]  Hearn went so far as to express doubt that at the penalty phase of a capital case she could conclude that a convicted murderer 'would probably commit some criminal acts of violence in the future.' [Citation.]  'People change,' she said, making it hard to assess the risk of someone's future dangerousness.  '[T]he evidence would have to be awful strong.' [Citation.]  But the prosecution did not respond to Hearn the way it did to Fields, and without delving into her views about rehabilitation with any further question, it raised no objection to her serving on the jury.  White panelist Mary Witt said she would take the possibility of rehabilitation into account in deciding at the penalty phase of the trial about a defendant's probability of future dangerousness, [citation], but the prosecutors asked her no further question about her views on reformation, and they accepted her as a juror, [citation]." (*Miller-El v. Dretke, supra,* 545 U.S. at pp. 244-245, fns. omitted.)

11

asked questions only of the black venire members, focusing on their 'associations' with persons who had drug involvement." (*Id*. at p. 272, fn. omitted.) The prosecution then used peremptory strikes against the two black members of the panel. When the prosecutor explained these two prospective jurors "apparently condone the use of drugs" because "no other juror . . . stated that they knew and were associating with individuals that [they knew had used drugs]," the trial court commented: "Maybe that's because you didn't give them an opportunity to because you only asked those questions of the two black jurors." (*Id*. at p. 273.) Nevertheless, the trial court denied defendant's *Batson* motion on the ground the prosecution had offered a neutral explanation that was not based on race. The Fifth Circuit reversed and ordered a new trial because white jurors *who gave exactly the same initial response* as the black jurors, i.e., that a family member or someone close had been involved with drugs, were examined no further and only the black jurors were asked for more details.

In *Miller-El*, the interjuror comparison analysis was fortified by the prosecution's purposeful misrepresentation of the prospective juror's views, and by a local history of intentionally excluding African Americans, both of which are missing here. *Williamson* is closer, but it is also inapposite. There, the prosecution posed clarifying follow-up questions only to the black jurors who answered yes to the trial court's question about illegal drug experiences, while ignoring the white jurors who answered the same question in exactly the same way. That is not what happened in the case at bar.

Marshall complains the prosecutor did not ask follow-up "acceptance of responsibility" questions of two white prospective jurors who answered yes to the arrest question. But neither of them reported a negative experience. Prospective Juror No. 1719 told the trial court: "If you go back 50 years . . . I had an arrest, malicious mischief." Asked if this would affect serving on the jury, this prospective juror said "no." Similarly, Prospective Juror No. 5239 said, "Yeah, reckless driving," in answer to the arrest question, but said it would not affect jury service. On the other hand, Prospective Juror No. 6131 *told the trial court* he had been angry about his domestic violence arrest. Unlike the other two, Prospective Juror No. 6131's response explicitly

12

raised a suspicion his resentment against the justice system might bias him against the People. Hence, it was legitimate for the prosecutor to ask him follow-up questions, but not the other two prospective jurors.

The trial court did not err by denying Marshall's *Wheeler/Batson* motion.

2. *Trial court did not err by allowing impeachment contrary to parties' stipulation.*

Marshall contends he was denied a fair trial because the court allowed the prosecution to impeach him with two prior felony convictions the parties had stipulated would not be used for that purpose. This claim is meritless.

a. *Background.*

On October 6, 2011, Judge Steven R. Van Sicklen held a hearing on a prosecution motion to admit Marshall's four prior felony convictions for impeachment purposes. These priors were: a 1995 conviction for being an accessory to a felony (§ 32); a 1995 conviction for reckless driving while fleeing the police (Veh. Code, § 2800.2); a 2004 conviction for transportation of marijuana (Health & Saf. Code, § 11360); and, a 2010 conviction for possession of a forged note (§476). The trial court indicated that, "[i]n the interest of justice," it would only allow use of the two most recent priors because "I think two is enough to make a point. More would be just piling on."

Subsequently, the parties informed a second judge, the one who would be conducting the trial, that they had reached the following stipulation regarding Marshall's priors: "We've . . . agreed to stipulate that the defendant is a felon for purposes of the People's case in chief; however, if the defendant testifies, his [two most recent] prior felony convictions . . . can be used for impeachment . . . but that his two older felony convictions . . . will not be used against him for purposes of impeachment."

During Marshall's direct examination, defense counsel had him acknowledge his prior felony convictions for transporting marijuana and receiving a stolen check. Marshall's direct examination then ended with this exchange:

13

"Q. [by defense counsel]. And you were present as the police officers Deputy Paz and Deputy Phillippi testified during this case. [¶] Are they being honest about what happened?

"A. Oh, no. That's what enrages me, the fact they can get on this stand and perjure and say that they did not hit me and say that they gave these commands that they did not give and say that they did not hear my commands, me surrendering, me submitting, and saying also that he seen me with a weapon. I don't believe this. This is an outrage. I don't believe . . . the system would allow such testimonies, such statements being given without the facts to prove it."

Before the prosecutor began cross-examination, she argued at sidebar that Marshall had "opened the door" for impeachment with the other two priors by giving the impression he was "a law-abiding citizen" who had suffered a "travesty of justice." The prosecutor said she had been planning to abide by the stipulation until Marshall delivered "this entire diatribe about police and justice, he's just minding his own business . . . , the officers are lying." The following colloquy then occurred:

"[Defense counsel]: I think any point my client testified [to] his testimony would be opposite of what the police officer said.

"The Court: Well, here's the thing: He's . . . only admitted to two felonies.

"[Prosecutor]: Right.

"The Court: But he was convicted of a third [*sic*]. [¶] . . . [¶] That's not quite honest. So I'm going to allow [the prosecutor] to get into the fact that he was convicted of not just those two things, but other things. [¶] Now, as far as the nature of the conviction . . . it is inflammatory. You're going to offer it to basically prove he ran before he ran again, and . . . that's problematic.

"[Prosecutor]: Okay. So I'll just offer the convictions.

"The Court: Yeah, without naming it . . . ."

On cross-examination, the prosecutor asked Marshall: "[Y]ou also have two earlier felony convictions from 1995. Isn't that also true?" Marshall acknowledged it was.

14

b. *Discussion*.

In *People v. Dyer* (1988) 45 Cal.3d 26, the prosecutor stipulated not to impeach Dyer with any of his prior convictions and, when asked by defense counsel if that meant defense character witnesses would not be asked about the priors, the prosecutor said it did. The defense called a witness who had worked with Dyer at Oakland Head Start and asked if she knew anything about his reputation. When the witness said she did, the trial court held an in camera hearing to clarify the scope of the stipulation. The prosecutor said it had never been his understanding the defense could put on evidence showing Dyer was "peaceful and nonviolent and that I would withhold from this jury that he has in the past been involved in life-threatening and very violent behavior." (*Id*. at p. 56.) The prosecutor argued this would allow "the jury [to get] this false notion that [Dyer] has been nonviolent in his past." (*Id*. at p. 55.)

The trial court ruled the prosecutor could impeach the character witness with Dyer's priors because "there was no reason for the prosecutor intentionally to forgo his right to impeach defendant's character witnesses, and defense counsel never indicated that he meant to obtain from the prosecutor a waiver of his right to impeach any witness on defendant's veracity or his lack of violent propensities." (*People v. Dyer, supra,* 45 Cal.3d at p. 56.)

Our Supreme Court affirmed this ruling: " 'A party seeking relief from the burdensome effects of a stipulation may, in some cases, be fully protected by *interpretation*, i.e., by enforcement of the stipulation in a reasonable and nonburdensome way.' [Citation.] The court followed that procedure here; it did not purport to release the prosecutor from his stipulation, but merely interpreted it to reflect the probable intention of the parties. [¶] . . . The trial court in effect found . . . that the stipulation, as interpreted by defense counsel, should not be binding." (*People v. Dyer, supra,* 45 Cal.3d at p. 57.)

*Dyer* involved the disclosure of particular prior conduct, viz. the defendant's commission of violent crimes, in order to contradict the character witness's presumed testimony she knew him to be a non-violent person. Here, the evidence of Marshall's

15

prior criminal conduct was disclosed in order to dispel the general aura of innocence he created by delivering a passionate speech about having been victimized by outrageous police conduct. The trial court had initially indicated impeachment with two priors was sufficient to alert the jury Marshall's denial of being armed might not be trustworthy. But when Marshall ended his direct examination by expressing outrage at the officers' alleged dishonest and violent conduct toward him, the trial court properly concluded a fair balance could only be restored by allowing the prosecution to advise the jury Marshall had four, not two, prior convictions.

Marshall's reliance on *People v. Quartermain* (1997) 16 Cal.4th 600, is misplaced. In that case, a death penalty prosecution, "[b]efore trial, the defendant waived his constitutional right to remain silent and gave a statement to the prosecutor after the prosecutor agreed not to use the statement in court. At trial, however, the prosecutor breached this agreement and used the many contradictions between defendant's statement and his testimony to impeach defendant's credibility. Under the controlling United States Supreme Court precedents, the prosecutor's use of the statement in breach of the agreement with defendant was fundamentally unfair and a violation of defendant's federal constitutional right to due process of law. [Citation.] Because we cannot conclude beyond a reasonable doubt that the error was harmless, we reverse the judgment in its entirety." (*Id*. at pp. 606-607.) As *Quartermain* makes clear, the constitutional violation there stemmed from the prosecution's use of an empty promise *to induce* the defendant to incriminate himself.

Nothing like that happened in this case. The trial court reasonably interpreted the stipulation to mean Marshall would be free to deny having possessed a gun that day, thus implicitly suggesting the police had planted evidence, and only face the threat of being impeached by two prior convictions. But once on the stand, Marshall did much more than that. He launched into an impassioned speech blasting the police for gross misconduct, a speech that implicitly and disingenuously portrayed himself as an entirely law-abiding citizen, i.e., the sort who would be justifiably shocked and outraged by such conduct. This scenario was analogous to the defendant in *Dyer* putting on a character

16

witness to testify to his good qualities. As in *Dyer*, we believe the trial court here properly determined Marshall himself had "opened the door" to having the jury hear all available impeachment evidence by unfairly stepping outside the bounds of the stipulation.[3]

In any event, even assuming arguendo the evidence should not have been admitted, there was no resulting prejudice. Marshall asserts he "was never given the opportunity to decide whether he should testify given that he would be impeached with four convictions, rather than just two convictions." But it is clear that, as a practical matter, Marshall had to testify because he was the only witness who could have contradicted the officers' testimony, and thus there was really no strategic choice involved. Hence, we have a situation that is similar to the one in *Dyer*: "Defendant's decision to testify was not in any way affected by the disputed portion of the stipulation . . . . The only 'prejudice' defendant suffered is that he was denied the opportunity to offer unchallenged and unimpeachable evidence of his 'good' reputation. Accordingly, even assuming error, defendant was not materially prejudiced by the court's ruling." (*People v. Dyer, supra,* 45 Cal.3d at pp. 57-58.)[4]

---

[3] For analogous "opening the door" situations in a different context, see *People v. Taylor* (1972) 8 Cal.3d 174, 182 [evidence of prior possession of contraband, although obtained by illegal search, is admissible for impeachment if defendant does not merely deny committing the charged crime but "makes a sweeping claim that he has never dealt in or possessed any narcotics"]; *People v. Flores* (1982) 128 Cal.App.3d 512, 523 [defendant opened the door to further cross-examination by testifying he not only did not make the charged drug sale, but he had never sold drugs to anyone: "[T]he prosecutor asked only about the sale to Moore and Flores attempted to convey an impression of cleanliness . . . beyond what was called for by the question. As did the trial court, we do not think a defendant should be permitted to continue to project such an impression if it is false."].)

[4] Contrary to Marshall's assertion that the disputed priors were too remote to be properly used for impeachment, distant priors are not too remote where the defendant has not subsequently led a blameless life. (See *People v. Green* (1995) 34 Cal.App.4th 165, 182-183 [where a prior conviction was 20 years old]; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 647-648 [where a prior conviction was 20 years old].)

17

Marshall was not denied a fair trial.

3. *Review of in camera <u>Pitchess</u> hearing.*

Marshall requests review of the trial court's ruling on his motion seeking discovery under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Review of the in camera hearing by this court reveals no abuse of the trial court's discretion. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

18